REPUBLIC STEEL CORPORATION (CEN-
TRAL COUNCIL OF STEEL PLANTS,
NORTHERN DISTRICT, REPUBLIC
STEEL CORPORATION et al., Interven-
ors) v. NATIONAL LABOR RELATIONS
BOARD (STEEL WORKERS ORGANIZ-
ING COMMITTEE, Intervenor).

.No. 6907.

Circuit Court of Appeals, Third Circuit.

Nov. 8, 1939.

474

Luther Day and Thomas F. Patton, both of Cleveland, Ohio, Mortimer S. Gordon, of New York City, and Joseph W. Henderson, of Philadelphia, Pa. (Jones, Day, Cockley & Reavis, of Cleveland, Ohio, and Rawle & Henderson, of Philadelphia, Pa., on the brief), for Republic Steel Corporation.

Frank T. Bow, of Canton, Ohio (Harvey F. Ake and John P. Walsh, both of Canton, Ohio, on the brief), for Central Council of Steel Plants.

Robert B. Watts, Associate Gen. Counsel, of Washington, D. C. (Charles Fahy, Gen. Counsel, and Ruth Weyand, Atty., both of Washington, D. C., on the brief), for National Labor Relations Board.

Lee Pressman, of Washington, D. C. (Joseph Kovner and Anthony Wayne Smith, both of Washington, D. C., on the brief), for Steel Workers Organizing Committee.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

MARIS, Circuit Judge.

Upon a complaint based upon charges filed by the Steel Workers Organizing Committee (hereinafter called S. W. O. C.), a labor union organization affiliated with the Committee for Industrial Organization, the National Labor Relations Board found the Republic Steel Corporation (hereinafter called Republic) guilty of unfair labor practices and ordered it to cease and desist from them and to take certain affirmative action which the Board found would effectuate the policies of the National Labor Relations Act. Republic thereupon petitioned this court to review and set aside the order as contrary to law.

Republic is a large manufacturer of steel, having plants at Youngstown, Canton, Massillon, Warren and Cleveland, Ohio, among other places. In June, 1936, S. W. O. C. began a campaign to organize Republic's employees. Three years before, in June, 1933, Republic had introduced into each of its plants a plan of employee representation. These plans, company imposed and dominated ones, were doubtless a concession to the mandate of Sec. 7 (a) of the National Industrial Recovery Act of 1933, 48 Stat. 198, "That employees shall have the right to organize and bargain collectively through representatives of their own choosing. * * *" At least the record of Republic would indicate that this modest concession to the right of collective bargaining was not wholly voluntary.

Almost immediately after S. W. O. C. commenced its organization campaign Republic in its turn began a counter campaign to crush the union. It announced to all its employees at once that "Republic stands for the 'Open Shop' principle," that "No employee has to join any organization to get or hold a job," and that "Every Republic employee owes a duty of loyalty to the Company so that its best interests may be served. Conduct detrimental to the interests of the Company and which may disrupt the satisfactory relations between employees and management will not be tolerated." The union was denounced and vilified. From the beginning the organizers of the union were followed and spied upon by Republic's company police. The latter also maintained surveillance over union meetings, thus discouraging employee attendance. Employees were threatened with discharge if they accepted union literature outside the plant gates. Union organizers were attacked and brutally beaten.

When in March, 1937, the employee representatives under the representation plans then in effect in Republic's plants proposed to amend them so as to eliminate company domination and provide for real collective

bargaining Republic refused its consent. On the other hand it caused many of the employee representatives to spread anti-union propaganda and to campaign actively against the union in its plants. On March 17, 1937, the United States Steel Corporation and its subsidiaries signed a union contract with S. W. O. C. as the representative of its members who were employees of those companies. The next day Republic called a meeting of the central council of its employee representatives at which a motion was unanimously adopted that all the representatives back the management in opposition to all outside labor organizations.

Employees were coerced by foremen and representatives to sign petitions supporting the representation plans and opposing S. W. O. C. Meetings of employees were held by the management at which the virtues of the representation plans were praised; employees were threatened with discharge if they joined the "outside" union, and anti-union literature was distributed. At least 18 employees, Cikah, Arias, Popik, Pirichy, Troyanovich, Naletrich, Korecky, Exall, Petak, Babich, Neuman, Ugranovich, Armeli, White, Fagan, Wright, Shaban and Mouyios, were discharged because of their activity in behalf of the S. W. O. C.

On March 30, 1937, Golden, regional director of S. W. O. C., requested a conference with Girdler, chairman of the board of Republic, and submitted a proposed union contract containing provisions respecting wages, hours, vacations, seniority and methods of handling grievances substantially equivalent to those then in force in Republic's mills. It also contained the following provisions:

"Section 2. Recognition.—The Corporation recognizes the Union as the collective bargaining agency for those employees of the Corporation who are members of the Union. The Corporation recognizes and will not interfere with the right of its employees to become members of the Union. There shall be no discrimination, interference, restraint or coercion by the Corporation or any of its agents against any members because of membership in the Union.
* * *

"Section 8. Management.—The management of the works and the direction of the working forces, including the right to hire, suspend or discharge for proper cause, or transfer, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Corporation: ·Provided, that this will not be used for purposes of discrimination against any member of the Union.

"Section 9. Discharge cases.—In the event a member of the Union shall be discharged from his employment from and after the date hereof, and he believes he has been unjustly dealt with, such discharge shall constitute a case arising under the method of adjusting grievances herein provided. In the event it should be decided under the rules of this Agreement that an injustice has been dealt the employee with regard to the discharge, the Corporation shall reinstate such employee and pay full compensation at the employee's regular rate for the time lost. All such cases of discharge shall be taken up and disposed of within five (5) days from the date of discharge."

No reply to the request for a conference was made until May 5th, when Republic's director of industrial relations wired "In view of Wagner Act see no necessity for signed contract" and suggested May 11th for a conference. A conference was held on that day without result, whereupon Republic issued a statement to its employees that it adhered to its policy not to sign a contract with the C. I. O. At about the same time Republic shut down its Canton tin plate mill, a stronghold of the union, and nearly all the mills of its Massillon works, and locked out all but the maintenance employees. These lockouts, coming after a long period of continual drastic anti-union measures, placed the union in a position where it could not hope to preserve itself without immediate resort to action. Accordingly on May 25th and 26th the union employees of Republic's Canton, Massillon, Youngstown, Warren and Cleveland plants went on strike.

The strike resulted in the closing of all of these plants and they remained closed for more than a month. Upon their reopening toward the end of June a great many of Republic's employees were refused reinstatement because of their union membership. Among these were Green, Hite, Lazer, Krill, Chismus, Haren, Neverdusky and DeLong. From the time the strike began Republic undertook to secure and did secure the aid of local police officials to break picket lines, enlisted workers in back-to-work movements and in other ways

endeavored to defeat the strike by reopening its plants without any concessions to the union. By threats to remove its plants Republic succeeded in causing municipal authorities and business men to turn against the union. Violence and hysteria were incited deliberately by Republic in order to terrorize union members. Tear gas and fire arms were donated to the police department of Massillon.

This course of conduct had its tragic result on the evening of July 11th in Massillon. The city police had been augmented by a number of specially deputized Republic foremen and other employees. On this evening the chief of police was absent. In his absence command of the police was taken by one Curley, who had come to the force with the hearty recommendation of Republic's district manager. Under Curley's leadership the augmented force made an unprovoked attack on an unarmed crowd of strikers at their headquarters, killing three of them and wounding many others. During the shooting, which continued for half an hour, none of the policemen received any sort of injury. Immediately after it was over one of the special policemen who was a Republic foreman led a group of his fellows in a round-up in which all persons in the neighborhood of union headquarters were arrested without warrants. These policemen in the early hours of the morning broke into rooming houses occupied by union members, dragged men from their beds and hauled them to jail where they were kept for several days.

Meanwhile on April 21, 1937, the Supreme Court had upheld the constitutionality of the National Labor Relations Act. Republic immediately took steps to eliminate some of the obviously objectionable features of its employee representation plans. In some plants these were replaced by new organizations but in each case they were dominated by Republic. After the strike a third group of organizations appeared in the Massillon, Canton and Youngstown plants. In form they were independent but in fact they were formed and officered in whole or in part by those who had been officers and representatives in the prior plans and who were known to be under Republic domination. They were accorded the use of Republic's time and property for organization purposes, including the solicitation of memberships and the collection of dues. Republic through its superintendents and foremen assisted in persuading employees to join them. Each of the three organizations was in fact but a continuation of its predecessor and was under the domination of Republic.

■ The foregoing brief recital is an epitome of the findings of fact made by the Board in an elaborate opinion. 9 N. L. R. B. 219. To further detail them would serve no useful purpose. Republic strongly urges that they are not supported by substantial evidence and must, therefore, be set aside. It points out evidence which is inconsistent with the findings. A great mass of testimony was taken in the case, much of it directly conflicting. The duty of reconciling this evidence was placed by the Act upon the Board, however, and not upon this court. Our sole duty is to determine whether there is in the record substantial evidence to support the Board's findings. Examining the record we find ample evidence to support these findings and they must, therefore, be sustained. Washington, Virginia & Maryland Coach Co. v. Labor Bd., 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965; National Labor Board v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. They in turn fully support the conclusion of the Board that Republic had engaged in unfair labor practices within the meaning of Sec. 8, subsections (1), (2) and (3), of the Act, 29 U.S.C. § 158 (1–3), 29 U.S.C.A. § 158 (1–3), (1) by interfering with, restraining and coercing its employees in the exercise of the rights guaranteed in Sec. 7 [1] of the Act, 29 U.S.C.A. § 157, (2) by dominating and interfering with the formation and administration of the employee representation plans and associations of its employees which succeeded them and by contributing financial and other support thereto, and (3) by discriminating in regard to the hire and tenure of employment of the 26 employees above mentioned.

■ Upon these findings and conclusions the Board ordered Republic to cease and desist from (a) dominating or interfering with the formation or administration of any labor organization of its employees or con-

---

[1] Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.

tributing financial or other support thereto; (b) discouraging membership in S. W. O. C. or any other labor organization of its employees, by discharging and refusing to reinstate employees, or otherwise discriminating in regard to hire or tenure of employment or any term or condition of employment or by threats of such discrimination; or (c) in any other manner interfering with, restraining or coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act. It is clear that under the Board's findings and conclusions this order was proper.

It remains for us to consider the validity of that part of the Board's order which required affirmative action to be taken by Republic. In this connection it is to be remembered that Sec. 10 (c) of the Act, 29 U. S. C. § 160 (c), 29 U.S.C.A. § 160 (c), authorizes the Board, if it finds that an employer has engaged in an unfair labor practice, to require him to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of the Act. Sec. 1 of the Act, 29 U. S. C. § 151, 29 U.S.C.A. § 151, declares that it is the policy of the United States "to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

■ The directions for affirmative action are contained in section 2 of the Board's order. The section is subdivided into paragraphs which will be considered consecutively. Paragraph (a) directs Republic to withdraw recognition from and disestablish the labor organizations of its employees which the Board found it had dominated, interfered with or supported in violation of Sec. 8 (2) of the Act. Paragraph (h) directs the posting of notices that this has been done. As we have already indicated, the evidence supports the Board's finding that these organizations were dominated, interfered with or supported by Republic. The original employee representation plans were imposed by Republic upon its employees and as originally drawn they were incapable of serving as collective bargaining agencies representing the employees. The changes in form made after the decision of the Jones and Laughlin case (National Labor Board v. Jones & Laughlin, Steel Co., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352) and after the strike did not change their nature. They continued in charge of employees who had been active in the original organizations and who were known to be under Republic's domination. The organizations continued to enjoy the sunshine of Republic's favor in many ways. Employees were made to feel that membership in them was advisable in order to hold their jobs. They were undoubtedly what have come to be known as "company unions." It is clear that so long as these organizations exist Republic's employees will be unable to exercise and enjoy that free choice of bargaining agents which the Act intends that they should have. The Board's order of disestablishment was, therefore, proper. National Labor Board v. Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Board v. Pacific Lines, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838; National Labor Board v. Fansteel Corp., supra; National Labor Relations Board v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, certiorari denied 60 S.Ct. 142, 84 L.Ed. ——; Titan Metal Mfg. Co. v. National Labor Relations Board, 3 Cir., 106 F.2d 254, certiorari denied 60 S.Ct. 260, 84 L.Ed. ——.

■ Since the order ran only against Republic the so-called company unions, some of which were permitted to intervene in this court, were not entitled to notice and hearing before the Board. National Labor Board v. Greyhound Lines, supra. Their application to this court for leave to adduce additional evidence must be denied. National Labor Relations Board v. Stackpole Carbon Co., supra.

■ Paragraphs (b) and (c) of Section 2 of the Board's order require Republic to reinstate with back pay 14 employees, 6 who were discharged for union activities, and 8 who were refused reinstatement after the strike because of union membership. In the cases of 12 other employees who were similarly discharged and subsequently reinstated or offered reinstatement, Republic is required to make them whole for pay lost for the period before the strike. Paragraphs (d) and (e) direct Republic to make whole those employees of its Canton and Massillon mills who were locked out in May, 1937,

for the pay lost during the period of the lockouts. The Board's findings of discrimination as to these employees are sustained by the evidence, as we have already pointed out. It follows that the order is justified under Sec. 10 (c) of the Act in order to effectuate its policies. National Labor Board v. Jones & Laughlin, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Board v. Mackay Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381.

■ One phase of this part of the order requires special mention. The order provides that any sums which these employees may have received in the interim for work performed upon federal, state, county, municipal or other work relief projects shall be deducted from the amounts ordered to be paid to them by Republic and shall be paid over to the appropriate governmental agencies which supplied the funds for the work relief projects. Republic urges that this provision is beyond the Board's jurisdiction. We think, however, that it is within the discretionary power of the Board and that it is not unreasonable. A similar order was enforced in National Labor Relations Board v. Planters Mfg. Co., 4 Cir., 105 F.2d 750.

■ There remain for our consideration paragraphs (f) and (g) of Section 2 of the Board's order. These paragraphs require Republic to offer to employees who went on strike, reinstatement in their former or equivalent positions or, if positions cannot be provided for them by dismissing new employees taken on since the strike, then to place them upon a preferential list for employment when available, and if they are not thus reinstated or placed on the preferential list to reimburse them for wages lost for the period beginning 5 days after their application. These provisions raise the major controversy in the case. This controversy is as to the cause of the strike. Republic vehemently contends that the strike was ·caused solely by its refusal to sign the contract submitted by S. W. O. C. This refusal the Board concedes was not an unfair labor practice. Consequently if Republic is right as to this the Board had no power to order the reinstatement of the strikers.

The Board, however, found "that the underlying cause of the strike, and a substantial factor in its precipitation on May 25th and 26th, was" Republic's "campaign to crush the union by means of the unfair labor practices" in which the Board found Republic had engaged prior to the strike, and which we have already described. We think that this finding is supported by the evidence and must be sustained. It is true that the strike was precipitated by Republic's refusal to sign the union contract and thus to recognize the union as the bargaining agent for its members. It is equally clear, however, that the signing of the contract was sought by the union not to raise wages or improve working conditions, for it purported to do neither, but solely to put an end to the warfare between the union and Republic which had resulted from the latter's unfair labor practices. What was sought, as the clauses of the contract hereinabove quoted demonstrate, was a formal declaration and agreement by Republic that it would not continue those practices but would recognize and not interfere with the right of its employees to become members of the union.

It is thus seen that the proposal to sign the contract was but a phase of the union's struggle against Republic's unfair labor practices and that the latter's refusal to sign was but one more indication that it proposed to continue those practices. The union contract in such a case as this becomes merely the symbol of the employer's acceptance of the union. If the contract is refused, we cannot say that the refusal is the cause of the ensuing strike, even though doubtless its acceptance would have averted it. The causes of the strike remain the unfair labor practices which the employer by his refusal of the proffered covenant of peace indicates that he will continue. As the Congress in Sec. 1 of the Act, 29 U. S. C. § 151, 29 U.S.C.A. § 151, significantly said: "The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest. * * *"

■ Republic further contends that the order for the reinstatement of the strikers was invalid because the complaint did not tender the issue of the reinstatement of the strikers. The complaint did, however, enumerate certain unfair labor practices and allege that because of these practices and of the refusal to sign the contract the strike took place. Section 10 (c) of the Act specifically authorizes the Board to direct reinstatement of employees if unfair labor practices are found. Republic was,

therefore, sufficiently informed that such action might be required by the Board.

It is argued that none of the strikers should be reinstated since they were all members of a combination and conspiracy and as such responsible for the acts of violence committed by some of their fellows. This argument, however, fails to take into account the provisions of Sec. 6 of the Norris-La Guardia Act, 29 U. S. C. § 106, 29 U.S.C.A. § 106, which prohibit courts of the United States from holding members of a union participating in a labor dispute responsible "for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." The act applies to this proceeding for the enforcement of the Board's order. No proof of actual participation, authorization or ratification was offered with respect to the strikers generally. Equally untenable is the contention that the strikers are not entitled to reinstatement because they have not come into court with clean hands. This principle is not applicable to a proceeding in which a governmental agency is seeking enforcement of its order in the public interest. National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, certiorari denied 304 U.S. 576; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 99 F.2d 533.

Finally Republic contends that the Board had no power to require the reinstatement of the individual strikers who had been guilty of criminal conduct in connection with the strike and it sought from the Board and from this court leave to present evidence on this subject. While leave was refused by the Board it treated Republic's offers of proof as evidence in deciding the case and we have done the same. Republic's petition for leave to adduce additional evidence will accordingly be denied.

In National Labor Board v. Fansteel Corp., supra, the Supreme Court had before it a case involving the reinstatement of strikers who had been guilty of unlawfully seizing and holding their employer's buildings in a "sit-down" strike. The court held that their reinstatement would not effectuate the policies of the Act and that it was, therefore, beyond the power of the Board to order it. In that case Chief Justice Hughes said, 306 U.S. at page 253, 59 S.Ct. at page 495, 83 L.Ed. 627, 123 A.L.R. 599: "The employees had the right to strike but they had no license to commit acts of violence or to seize their employer's plant. We may put on one side the contested questions as to the circumstances and extent of injury to the plant and its contents in the efforts of the men to resist eviction. The seizure and holding of the buildings was itself a wrong apart from any acts of sabotage. But in its legal aspect the ousting of the owner from lawful possession is not essentially different from an assault upon the officers of an employing company, or the seizure and conversion of its goods, or the despoiling of its property or other unlawful acts in order to force compliance with demands. To justify such conduct because of the existence of a labor dispute or of an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which lie at the foundations of society."

In the Fansteel case the court was dealing with a case which involved a sit-down strike in which the strikers forcibly and unlawfully deprived their employer of possession of his plant. The court made it clear that unlawful conduct of that character deprived the participant of the right of reinstatement. We think it must be conceded, however, that some disorder is unfortunately quite usual in any extensive or long drawn out strike. A strike is essentially a battle waged with economic weapons. Engaged in it are human beings whose feelings are stirred to the depths. Rising passions call forth hot words. Hot words lead to blows on the picket line. The transformation from economic to physical combat by those engaged in the contest is difficult to prevent even when cool heads direct the fight. Violence of this nature, however much it is to be regretted, must have been in the contemplation of the Congress when it provided in Sec. 13 of the Act, 29 U.S.C.A. § 163, that nothing therein should be construed so as to interfere with or impede or diminish in any way the right to strike. If this were not so the rights afforded to employees by the Act would be indeed illusory. We accordingly recently held that it was not intended by the Act that minor disorders of this nature should deprive a striker of the possibility of reinstatement. National Labor Relations Board v. Stackpole Carbon Co., supra.

In the present case there was evidence of violence and disorder on the part

of many strikers. Numbers of them were convicted of crimes in the state courts. The Board accordingly undertook to determine which of these were sufficiently serious to bar reinstatement. This it did without the benefit of the Fansteel opinion, which was not handed down until four months later. In making its determination the Board confined itself to evidence of convictions and properly refused to try accusations of violence which had not resulted in convictions in the criminal courts. It decided that all strikers who had been convicted of possession and use of explosives, malicious destruction of property to the value of $300, and possession of a bomb, all felonies, should be denied reinstatement, but that all others who had been convicted of less serious offenses should be reinstated. Among these others were 9 convicted of unlawfully obstructing and retarding the passage of the United States mail, 3 of discharging firearms, 7 of malicious destruction of property to the value of less than $300, 1 of unlawfully interfering with telegraph or telephone messages, 1 of transporting explosives, 5 of interfering with and obstructing railway tracks, 13 of carrying concealed weapons, and 1 of assault and battery sufficiently serious to call for the imposition of a fine of $200 and costs and a suspended sentence of 6 months.

Whether all of these defendants were striking Republic employees does not clearly appear from the record although it seems that they were all affiliated with S. W. O. C. We think, however, that their offenses were sufficiently serious to render the reinstatement of those of them who were Republic employees inappropriate and improper under the rule laid down in the Fansteel case. Paragraph (f) of Section 2 of the order of the Board is accordingly modified to this extent. As to the remaining offenses proved to have been committed we are satisfied from their character and from the small penalties imposed that they were all sufficiently minor to come within our decision in the Stackpole case and the order of the Board directing the reinstatement of the persons involved in them will be enforced.

Republic raises certain objections to the form of the order. Its principal complaint is to a provision that employees directed to be reinstated for whom no positions are presently available shall be placed on a single preferential hiring list for all of Republic's plants in Ohio, in Monroe, Michigan, and in Pittsburgh and Beaver Falls, Pennsylvania. The objection is as to the provision directing possible reinstatement at a plant other than that at which the employee formerly worked. The Board has power to make such an order, however. National Labor Relations Board v. Remington Rand, Inc., supra. We do not think that its use in this case was an abuse of the discretion vested in the Board. We have also carefully considered Republic's other objections to the form of the order. Finding them without merit we will not discuss them further.

Finally Republic contends that it was not accorded procedural due process by the Board. We think that this point also is wholly without merit. After lengthy hearings the Board issued its findings and order on April 8, 1938. On June 14, 1938, after proceedings in this court and in the Supreme Court, In re National Labor Rel. Board, 304 U.S. 486, 58 S.Ct. 1001, 82 L.Ed. 1482, the Board set aside its findings and order. On July 8, 1938, it issued a draft of proposed findings and order. Thereafter both Republic and S. W. O. C. filed exceptions to the proposed findings and order and also filed briefs in support of their exceptions. Oral argument upon the exceptions was had before the Board on August 11, 1938, participated in by counsel for Republic and S. W. O. C. On October 18, 1938, the Board issued the findings and order now before us for review. It is obvious from this recital that Republic was not denied due process. See National Labor Board v. Mackay Co., supra; Consolidated Edison Co. v. National Labor Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

Paragraph (f) of Section 2 of the order of the Board is modified as hereinabove indicated. In all other respects the order is affirmed. A decree enforcing it will be entered.