**ROEBLING EMPLOYEES ASS'N, Inc., v. NATIONAL LABOR RELATIONS BOARD et al.**

**NATIONAL LABOR RELATIONS BOARD et al. v. JOHN A. ROEBLING'S SONS CO.**

No. 7263, 7334.

Circuit Court of Appeals, Third Circuit.

April 28, 1941.

H. Collin Minton, Jr., of Trenton, N. J., for Roebling Employees Ass'n.

Morris P. Skinner, of Newark, N. J., for John A. Roebling's Sons Co.

Malcolm F. Halliday, of Washington, D. C., for National Labor Relations Board.

Before BIGGS, MARIS, CLARK, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

In a proceeding duly had, the National Labor Relations Board entered an order[1] directing (in part here complained of) that the respondent, John A. Roebling's Sons Company, cease and desist from dominat-

ing or interfering with the administration of Roebling Employees' Association, Inc., or with the formation or administration of any other labor organization of its employees and further directing that the respondent take certain affirmative action, including the withdrawal of all recognition of Roebling Employees' Association, Inc., as the agent of respondent's employees for collective bargaining purposes.

The matter is here upon a petition for review filed by Roebling Employees' Association, Inc. (hereinafter referred to as the Association), which was granted leave to intervene in the proceeding before the Board and which now seeks to have the Board's order vacated and set aside. The National Labor Relations Board also petitions for a decree enforcing the Board's order. The Association asserts that, both in its organization and administration, it represents the free and uncoerced exercise of the will of its members (more than a majority of the respondent's employees). The respondent on its part denies that it has dominated or controlled the Association or has interfered with or coerced its employees in respect of their right to bargain collectively through a representative of their own choosing.

Prior to 1933, no labor organization existed among the respondent's employees at its plants in Trenton and Roebling, New Jersey. In that year (1933), the respondent instituted a Plan of Employee Representation covering both of its plants. According to the testimony of the respondent's president, W. A. Anderson, the Plan was similar in design to what "all the steel companies considered * * * feasible" at that time, that is, "during the period of N.R.A."[2] as Anderson phrased it.

The Plan called for the election of employee representatives from various departments and "natural subdivisions" of the respondent's plants and for the appointment by the management of an equal number of regular representatives of the company and one special company representative. As the Plan directed, an equal num-

---

[1] 17 N.L.R.B. 482, 502.

[2] In Republic Steel Corporation et al. v. National Labor Relations Board, 3 Cir., 107 F.2d 472 (modified on a point not here material, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——), this court had occasion to observe (page 474) that "in June, 1933, Republic had introduced into each of its plants a plan of employee representation. These plans, company imposed and dominated ones, were doubtless a concession to the mandate of Sec. 7 (a) of the National Industrial Recovery Act of 1933, 48 Stat. 198, 'That employees shall have the right to organize and bargain collectively through representatives of their own choosing. * * *'"

ber of employee representatives and of regular company representatives should constitute a Joint Committee, whose principal function was to consider grievances arising out of the employer and employee relationship, if other methods for settlement provided for by the Plan failed to satisfy the grievance. The Plan further provided that in the event the Joint Committee was unable to agree upon the proper settlement of a grievance, the matter might be arbitrated provided that the respondent's general manager and a majority of employee representatives agreed to that procedure. The Plan required that employee representatives should be non-supervisory employees of the respondent who were over twenty-one years of age and American citizens; and an employee representative was to be deemed to have vacated his office upon the termination of his employment, his permanent transfer from one voting unit to another (i. e. department or "natural subdivision" of the plants), or upon his promotion to a supervisory position. The company obligated itself to pay employee representatives in an amount "commensurate with their average earnings" for time lost by them from their work because of their duties as employee representatives. The Plan put the duty of providing a suitable place for the meetings of representatives upon the chairman of the employees' representatives and the management's special representative. Amendment of the Plan could be made only by a vote of two-thirds of the entire membership of the general Joint Committee (this necessarily required the approval of a requisite number of management representatives) or by concurrent majority vote of the employee representatives and of the management representatives at an annual conference.

■ The Board found that the Plan "was interfered with in its formation and administration and was dominated and supported by the respondent". We do not understand the respondent to question the merit of this finding. In any case, it is fully warranted by the evidence. The Board expressly refrained, however, from basing an order upon the finding in as much as the respondent's domination of the Plan was not an allegation of the complaint. Nevertheless, the fact thus established with regard to the status of the Plan as a company union is important and assumed additional significance consequent upon the passage of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.[3] After the passage of the Act, the respondent, as formerly, continued to support and maintain the Plan in operation uninterruptedly even after the decision of the Supreme Court on April 12, 1937, upholding the Act's constitutionality. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

In December 1936, the Steel Workers Organizing Committee (C.I.O.) began organizational activities, including a membership campaign, among the respondent's employees at its Trenton plant. A few weeks later (January 27, 1937) Anderson, the respondent's president, addressed a letter to the employees on his official company stationery. The letter opened with a reference to the current campaign by "outside union organizers" for members among the company's employees. It cited Anderson's recognition of his professed duty to inform the employees of the results that would follow should they (the "outside union organizers") be successful "in misleading you". He stated that the membership cards which the employees had been asked to sign were powers of attorney and that signing them would mean that an employee would no longer be a free agent to deal with the company regarding "rates of pay, wages, hours of employment or other conditions of employment". He said that, upon signing the cards, the employees would have no further voice in selecting their own representative to deal for them and that thereby this power would be given to outsiders[4] over whom the employees

3 See National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 249, 60 S.Ct. 203, 84 L.Ed. 219; National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 268–271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Pacific Greyhound Lines, Inc., 303 U.S. 272, 273, 58 S.Ct. 577, 82 L.Ed. 838.

4 The connotation of the terms "misleading", "outsiders", and "strangers", as applied by the respondent to adversaries in a labor controversy, has an appropriate place in a consideration of the respondent's attitude toward "outside" labor organizations and the probable effect of that attitude upon the employees. Cf. National Labor Relations Board v. General Motors Corp., 7 Cir., 116 F.2d 306,

would have no control. He warned that if enough employees were "misled" into signing the cards, they would thus empower strangers to represent them and that, once the employees signed, "there can be no 'dropping out' if you are dissatisfied". The letter concluded with an expression of Anderson's confidence that no one would lightly sign away his rights as an employee of the company if he knew all of the facts.

██ The Board found that the letter as a whole was calculated to impress upon the employees the respondent's hostility to their joining an "outside" union and its preference for the type of organization which it had introduced into its plants. From this, the Board concluded that "the respondent, by circulating this letter, has interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act". In so doing we think the Board was justified. As was said by the Supreme Court in International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 88, 85 L.Ed. ——, "Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure." See also National Labor Relations Board v. Link-Belt Co., 61 S.Ct. 358, 365, 366, 85 L.Ed. ——.

The letter is plainly susceptible of the interpretation which the Board placed upon it. Not only does the letter's own import plainly so indicate but Anderson's frank admissions with respect to it confirm the Board's construction. When asked the purpose of sending the letter to the employees, Anderson testified:

"A. The purpose was very evident on the face of it.

"Q. Oh, I think so, too, but I thought you might want to give a further explanation of why you sent it. A. No, I just thought it would be a good thing to advise all the people employed by the company just what they were signing if they signed up with the CIO or the SWOC. They have always had perfectly satisfactory relations with the company in all the time that I have been there. That was the main purpose of the letter.

"Q. You did not look upon the entrance of the CIO with any favor, did you? A. I do not look on the entrance of any outsiders in the relation between the employer and the employee with any favor.

"Q. You thought the Employees' Representation Plan which they had at that time in effect was sufficient to take care of any matters between you and your employees, did you not? A. Yes, I did."

The expressions and implications of the letter were never repudiated or retracted by the respondent. Throughout the formation and administration of the Association, the effect which the letter was intended to produce was left unremedied by the respondent.

By way of extenuation, the respondent argues that the letter was in answer to a provocative and deceptive circular which the representatives of S.W.O.C. had mailed or handed out to employees of the respondent shortly before. This circular was contained in an envelope which bore on its back the legend, "A Message to You from the President". The enclosed circular, which contained an argument for joining and an exhortation to join the union, carried as a headline the statement that "The President Wants You to Join the Union". If it was the President of the United States to which the legend and the statement were intended to refer (and, presumably, it was), the action was of course improper, and Anderson had a right to answer it in order to dispel the false impressions which might have been thus created. But, as the Board correctly found, Anderson's letter (which we have already summarized in substantial part) "went far beyond a discussion of the impression given by the S.W.O.C. literature concerning the President of the United States". The only thing the letter contained in such regard was a brief paragraph that "The cards are not from re-

---

309; National Labor Relations Board v. Lane Cotton Mills, 5 Cir., 111 F.2d 814, 815, 816; National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 786; Union Drawn Steel Co. et al. v. National Labor Relations Board, 3 Cir., 109 F.2d 587, 589; Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 107 F.2d 472, 474, modified on another point, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——; Swift & Co. v. National Labor Relations Board, 10 Cir., 106 F.2d 87, 92; McNeely & Price Co. v. National Labor Relations Board, 3 Cir., 106 F.2d 878, 881; Titan Metal Mfg. Co. v. National Labor Relations Board, 3 Cir., 106 F.2d 254, 259, certiorari denied 308 U.S. 615, 60 S.Ct. 260, 84 L.Ed. 514.

sponsible Government officials as they would have you believe". Even if the refutation thus implied was a purpose of Anderson's letter, he utilized the occasion to express for the respondent its dislike of and hostility to "outside" labor organizations and, by the same token, its preference for the company dominated union such as then existed under the Plan.

█ The respondent now also argues in relation to the letter that, even though it constituted a violation of the Act, the respondent should not be held accountable for it, as it was written two and one-half months before the validity of the Act was sustained by the Supreme Court. This argument ignores the fact that the Act was a part of the law of the land from the date of its enactment. Actually, Anderson was well aware of the Act. Not only does his testimony so indicate but the quotation in his letter concerning rates of pay, etc., was in the very words of the Act. Sec. 9 (a).

██ The respondent continued to participate in the operation of the Plan and failed completely to recognize or, at least, to indicate the legal necessity for the prompt termination of the Plan. As a consequence, the stated annual election of employee representatives was held on May 11, 1937. The Board found that the respondent furnished the ballots and other election paraphernalia and paid the tellers, as it had done in the prior elections held under the Plan; and there is substantial evidence to support this finding. Anderson testified that the election of May 11 "was held just as other elections had been held". The testimony of Superintendent Smith and Personnel Director Ross, upon which the respondent relies to dispute the finding, went no further at best than to raise a conflicting inference which it was the province of the Board to resolve. National Labor Relations Board v. Link-Belt Co., supra, 61 S.Ct. at page 365, 85 L.Ed. ——.

Notwithstanding that the respondent had not at any time evinced a desire or intention to terminate the Plan, with its peculiar type of employee representation, the newly elected employee representatives, following the May 11 election, began to entertain doubt as to the Plan's legality. As a consequence, George Catherine, chairman of the employee representatives, appointed a committee of such representatives, consisting of himself, Monard, Cantwell, Dillon and Schaum, to investigate the status of the Plan. All of the committee members except Schaum had been active leaders and officials under the Plan. The committee consulted an attorney on June 5, 1937, who advised them that the Plan was "out". They then instructed the attorney "to have some draft that would be legal and as near the old plan as possible". That the attorney succeeded in making the new very "near the old plan" is patent from a comparison of the provisions of the Plan with the by-laws of the successor Association. The two were similar in all essential particulars, except that the provision for company representatives under the Plan was, quite understandably, left out of the Association by-laws. But, the requirement that, to be a representative, one had to be an employee, which gave the management control over non-conforming representatives and precluded as well an outside representative even though the employees so chose, was in the Association by-laws just as it had been in the Plan.

A certificate of the Association's incorporation under the law of New Jersey was issued on June 10, 1937, Catherine, Monard, Cantwell, Dillon and Schaum acting as incorporators. Prior to the incorporation, Schaum and another employee representative (not identified) had called upon Superintendent Hunt and had informed him of the intention to form the Association and to incorporate it. No reason was ascribed by the representatives for keeping the respondent apprised of what was being done looking to a further arrangement for employee representation which, as the committee members intended, should be "as near the old plan as possible". This action of informing the company is the more peculiar in its contrast with the apparent lack of any information to the employees concerning the type of bargaining representative that was being set up for their acceptance. In due course, the promoters of the Association posted copies of its by-laws on the bulletin boards throughout the respondent's Trenton plant. There is no evidence of any objection by the respondent to the use of its facilities for the furtherance of the Association, which, about the same time, initiated an active drive for members.

The first election of representatives for the Association was held on July 29, 1937, under the supervision of two superintendents of local schools who were chosen for that purpose as a result of a con-

ference between the Association organizers and their counsel. In anticipation of the election, the school superintendents asked counsel for the Association for something for their guidance in conducting the election, and counsel prepared and delivered to them a "memorandum" which contained the following illuminating items:

"1. The purpose of forming this Association is to carry on the contract between employees and the employer formerly carried on by the Company Union. The Wagner Act outlawed any company union which might be fostered or encouraged by the employer. This Association puts in legal form this contact.

\* \* \* \* \*

"10. The formation of this Association does not confer any greater rights in the employees than that previously had under their former union. It is merely putting in legal form what previously existed, and which now is declared illegal in form. The company has always dealt fairly with employees in the past, and it is fair to assume that in the future its dealings with the delegates will be of the same nature."

On July 24 the school superintendents posted notices of the election throughout both of the respondent's plants. The notice stated, inter alia, that ballots would be distributed "during working hours on Wednesday, July, 28, 1937". On July 27 the school superintendents, accompanied by Catherine, Monard and Dillon, obtained permission from Personnel Director Ross to conduct the election on company premises and, as forecast by the election notice, the ballots were distributed in the plants during working hours the day before the election. The certificate of return made by the school superintendents, as the judges of the election, discloses that "The names printed on the said ballots were the names of the nominees in the prior election held May 11, 1937, under the old system, \* \* \*." And so it happened, not unexpectedly, that the representatives elected on July 29 included the leaders under the old system, Catherine, Monard, Cantwell, Dillon and Schaum, who, as we have seen, had also been elected at the May 11 election under the Plan.

On August 6, 1937, Catherine, Monard, Cantwell, Dillon and Schaum, together with one other Association representative, met with Anderson, the company's president, and Ross, its personnel director, to discuss recognition of the Association and a contract. After a discussion of approximately half an hour, Anderson recognized the Association as the bargaining agent of its members and entered into an oral agreement with it concerning working conditions. No written contract was entered into between the Association and the respondent. Following the meeting on August 6, several other meetings were held between officials of the respondent and the Association committee at which there was further discussion of working conditions. As a result of these discussions the management on September 8, 1937, issued a statement of a "Labor Policy" which was agreed to by the Association representatives. The "Labor Policy" was printed by the respondent and distributed to its supervisory staff and to the Association representatives but not to the employees generally. The statement was unsigned and the "Policy" would endure as the respondent willed. There is no evidence of any further effort on the part of the Association representatives to obtain "the execution of a workable contract."

After an exhaustive review of the evidence, the Board concluded that "the Association was not a new and truly independent organization but rather a continuation and reorganization of the Plan under a different name"; that "The reorganization was encouraged by the respondent's expressed hostility toward 'outside' unions, and its preference for a union limited to its own employees and by its domination and support of the Plan over a long period of time"; that "the respondent made its wishes sufficiently clear to the employees to deprive them of that free and unhampered choice of a bargaining agent to which they are entitled under the Act"; and, finally, that "the respondent dominated and interfered with the formation and administration of, and contributed support to, the Association."

The question which this case presents may be succinctly stated in the language of National Labor Relations Board v. Link-Belt Co., supra, 61 S.Ct. at page 361, 85 L. Ed. ——, viz: Was the Board justified in concluding that the Association was not the result of the employees' free choice because the employer had intruded to impair their freedom? The same question was involved in National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219, and in Westinghouse Elec-

tric & Mfg. Co. v. National Labor Relations Board, 2 Cir., 112 F.2d 657, affirmed per curiam by the Supreme Court (61 S.Ct. 736, 85 L.Ed. ——) on the authority of the Link-Belt and Newport News cases, supra.

In the cases just cited the decrees enforcing the Board's orders of disestablishment were approved by the Supreme Court. In each of those cases the transition from the unlawful company union to the successor union was, as the Board found, accomplished by the employer's interference with its employees' rights as guaranteed by Section 7 of the Act. In the instant case the Board has concluded to like effect. If the conclusion is justified by the evidence, then the ruling in the Westinghouse, Link-Belt and Newport News cases controls the decision here.

■ In our opinion the evidence in this case abundantly supports the conclusion that the formation and administration of the Association was dominated and controlled by the respondent in impairment, if not in deprivation, of its employees' right freely to choose their own bargaining agent. The respondent's institution and domination of the Plan; its maintenance of the Plan long after it had been outlawed; its openly expressed hostility to an "outside" union and its preference for an "inside" union; its failure to take any steps to terminate the Plan or to evidence an intention thenceforth to abide by the Act in full faith; and its disregard of its employees' right to bargain collectively by a representative freely chosen; its interest and assistance in the formation of the Association and the election thereunder; the continued effect of its domination and control as exemplified in the conduct of the leaders under the Plan who initiated the Association and forthwith became the leaders of the Association; the frank statement of the "memorandum" of counsel for the Association as to its real purpose,—that it was to put in legal form what the "Wagner Act [had] outlawed" and that the Association was not intended to confer any greater rights upon the employees than those previously had under the Plan, notwithstanding that the National Labor Relations Act accorded them greater rights; these, and more, constitute "the whole congeries of facts" from which it was permissible for the Board to infer that the formation, maintenance and administration of the Association was the result of the respondent's intrusion upon its employees'

rights under the Act. See National Labor Relations Board v. Link-Belt Co., supra, 61 S.Ct. page 361, 85 L.Ed. ——.

■ The ruling in the Westinghouse, Link-Belt and Newport News cases is equally applicable here. The teaching of those cases is plainly to the effect that, where an employer has maintained or supported a union in defiance of the law and a successor union is formed under circumstance reasonably giving rise to the inference that the successor evolved from the illegal predecessor, the Board is justified in concluding that the successor union was the product of the employer's interference with, restraint or coercion of his employees in the exercise of their rights. The inference arose in this case and remained unrebutted just as it did in the Westinghouse case where the facts, in their material features, are indistinguishable from the facts in the instant case.

The respondent and the Association both seek to distinguish the Westinghouse case from the present on the ground that in that case the Board found the employer guilty of discriminatory conduct in two instances. But the Court of Appeals for the Second Circuit [112 F.2d 660], expressly excluded "the two acts of discrimination" as having had any influence upon the decision in that case, which was squarely placed upon the ruling in the Newport News case. With the acts of discrimination in the Westinghouse case thus eliminated, the present is actually a stronger case against the employer. In the Westinghouse case the employer took exculpatory action through its plant manager who stated at a meeting of the "Joint Conference Committee" that the company would no longer support the plan, that it would be discontinued and that he was not interested in what plan the employees adopted, that that was their business. While this declaration was held to have been ineffectual because "the company did not seek to broadcast it or its equivalent in any way to the employees—about 2,500 in all", in the present case the respondent made no such announcement through anyone. The "line of fracture" (between the old and the new "inside" unions) whose absence was noted in the Westinghouse case was likewise wanting here,—a situation which is no less important in this case as evidencing a continuity of the respondent's domination of and interference with its employees in the exercise of their rights. In the Westinghouse

case, as in the present, "the employees at large had not been advised that the company was wholly indifferent whether they joined the new union, and that, as it might, and probably did, appear to be a successor of the old, the separation should have been made plain, and with it the discontinuance of any continued countenance from the employer."

The measure of control retained by the management in the successor union in the Newport News case, to which the respondent points as distinguishing that case from the present, was not material to that decision, as the opinion of the Supreme Court makes plain (308 U.S. pages 249, 250, 60 S. Ct. 203, 84 L.Ed. 219). Likewise, the discriminatory acts and the industrial espionage found against the employer in the Link-Belt case were but evidentiary of the employer's attitude toward unions and, in the quantity of the proofs, merely cumulative. The same hostile attitude on the part of the respondent was shown in this case (Anderson's letter and testimony), albeit of a different degree or form of expression. But, even without the Anderson letter the Board's ultimate conclusions are otherwise justifiable. We have treated with the letter because it is evidence supporting findings of the Board which the respondent and the Association assail.

■ Whether the order disestablishing the Association was the appropriate means "of wiping the slate clean and affording the employes an opportunity to start afresh in organizing for the adjustment of their relations with the employer" (National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., supra, 308 U.S. page 250, 60 S.Ct. at page 208, 84 L. Ed. 219) was a matter for the Board and not for the courts. National Labor Relations Board v. Link-Belt Co., supra, 61 S. Ct. page 366, 85 L.Ed. ——; International Association of Machinists v. National Labor Relations Board, supra, 311 U.S. 72, 61 S.Ct. page 89, 85 L.Ed. ——; National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., et al., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. Where, as here, the Board's order is based upon findings supported by substantial evidence, a court has no alternative but to enforce it.

■ One thing needs be said, however, with respect to implication arising from the form of the Board's order. As pointed out in the Westinghouse case, "To post notices

that the 'Independent' has been 'disestablished', and to say nothing more, may well lead the employees to conclude that any unaffiliated union will fall under the same ban." The court there was of the opinion that "The same reason which demands its 'disestablishment'—rigid impartiality between all kinds of organizations—demands public declaration that after it has been 'disestablished', the field will be open for the employees' choice of any form they prefer." The Board's order was amended accordingly. We entertain the same view and believe that the action taken in the Westinghouse case was in faithful service of the freedom from restraint or control, whether direct or indirect, which the Act was intended to secure to employees in the exercise of their rights. Consequently, the order in this case will be so amended by adding to the end of paragraph 2(a) the following: "but the employees are free to organize or join any union they choose, whether or not it is affiliated with a national union." In all other respects the order is a proper exercise of the Board's discretion.

A decree enforcing the Board's order as amended will be entered upon submission.