## NATIONAL LABOR RELATIONS BOARD v. CHATTANOOGA BAKERY, Inc., et al.

No. 8998.

Circuit Court of Appeals, Sixth Circuit.

April 15, 1942.

Malcolm F. Halliday, of Washington, D. C. (Robert B. Watts, Ernest A. Gross, Gehrhard P. Van Arkel, and Roman Beck, all of Washington, D. C., on the brief), for petitioner.

Cecil Sims, of Nashville, Tenn., for respondent.

Before MARTIN and McALLISTER, Circuit Judges, and SWINFORD, District Judge.

McALLISTER, Circuit Judge.

On petition for enforcement of an order of the National Labor Relations Board, finding unfair labor practices on the part of respondents,· providing for the posting of the usual notices, and requiring Chattanooga Bakery, Inc., to employ certain persons and pay lost earnings to them, and to reinstate employees who went on strike, together with remedial pay, the question presented is whether the Board's findings of fact are supported by substantial evidence.

For many years prior to 1939, the Mountain City Mill Company, a Tennessee corporation, was engaged in operating a mill and a bakery in Chattanooga, Tennessee. In 1938, an A. F. of L. union began to organize the employees, and, in August of that year, called a strike to secure recognition and enforce bargaining demands. The strike lasted until October, 1938, when the company entered into a contract with the Union, covering terms and conditions of employment and recognizing the Union as the exclusive bargaining representative of its bakery employees, for one year.

The president of the company was S. C. Hutcheson, who owned 63% of the capital stock. S. H. Campbell, Jr., a cousin of Hutcheson, was a director, and, with the Campbell family, owned approximately 30% of the stock. After considerable losses in 1937, the company, in the latter part of 1938, decided to sell its business and properties; and, apparently, some time in June, 1939, sold its mill business and properties to a new company, the Mountain City Mill Company, Inc.; and sold its bakery business and properties to another newly formed company, Chattanooga Bakery, Inc. In the new bakery company, S. H. Campbell, Jr., a director of the old company, became president and the owner of 30% of the stock; S. C. Hutcheson, president of the old company, became the owner of 18% of the stock; and new stockholders, for the most part, became owners of the balance of 52% of the stock. Campbell retained the same supervisory, sales, and office personnel that had formerly been employed in the bakery division of the mill company. About June 15, 1939, the old mill company caused notices to be posted in its plant, in which it advised all of its employees that it would dispense with their services and cease business as of June 30, 1939, and suggested that they apply for employment to the two new corporations, to be organized to take over the operations of the mill and the bakery departments.

In employing workers for the bakery company, President Campbell named a committee, consisting of superintendent Shauf, sales manager Parks, and warehouse superintendent Johnston, who had occupied these positions with the old mill company. According to Campbell's testimony, he instructed them to make the selection of personnel on the basis of the individual merit of the applicants for employment, including ability, physical fitness, character, and educational background. Shauf testified that he was told to hire the help that they could get along with and who were most efficient and could do the work right. He examined the applications, and the other members of the committee adopted his views, with the result that they rejected 27 applicants who had formerly worked in the bakery division of the old company, and all of whom were union members, with one possible exception, hereinafter noted. The company employed 46 other persons who had not worked in the bakery division of the old company. These new employees were not considered by the personnel committee, but were approved by individual department heads and foremen.

When the 27 old employees were not rehired, the Union had a conference with the president of the company, and upon his refusal to take action, a strike was called on July 14, 1939. Fifteen of the employees, who had been rehired, joined the strike, which was terminated by the Union, without success, on October 25, 1939. At that time the Union representatives asked the president to reinstate these 15 striking employees; but this was refused on the ground that they had quit voluntarily and were no longer employees of the company. The Board found that these employees went on strike in sympathy with the Union, and ordered them reinstated on the ground that the strike was caused by the company's unfair labor practices.

In considering the case, a review of the situation existing in the old company is pertinent. During the dispute in 1938, prior to the calling of the strike, evidence of the Board discloses that Richard Bean, the vice-president of the mill company, in July of that year, attended a meeting of Union officials and company employees, where working conditions were discussed. Thereafter, according to testimony, he sent for one of the employees, asking her what she thought she would gain by joining a union and why she should join a union. He further is claimed to have said that "the Union was painting a pretty picture"; that the employees were demanding entirely too much, and that the company could not afford to pay them the wages asked. He is said to have further stated that he would like to know just why the employees should put their confidence in the leader of the union "who had already ruined two companies"; that he didn't have any use for the Union and didn't see what profit anyone

could have by letting the Union run their shop. The representative of the Union testified that about the middle of July, 1938, either Hutcheson or Bean, in the course of negotiations, stated to the Union bargaining committee that the plant had been operating for a number of years; that they had had no labor trouble; that everything had gone along all right until the Union representative came into the situation, and by painting a flowery picture, had made the workers dissatisfied; that the company was paying all the wages it could pay; and that "if the Union didn't leave them alone, they were going to shut the thing down and sell it out." Bean was not a witness at the hearing and Hutcheson failed to contradict this testimony.

From the evidence adduced on behalf of the Board, it appears that after the settlement of the 1938 strike, superintendent Shauf, in discussing a certain dispute with one of the employees regarding seniority, stated, with reference to the Union, that the company was in the thing for a year, and he would do the best he could with it, but as soon as the year was up, the company would try to work up something for its own benefit. According to other testimony, when one of the employees asked the superintendent for help in getting work for his wife, he inquired how the wife felt about the Union and stated that if the employee would assure him that his wife would not join the Union, he would give her a job; that the company did not like the Union in the bakery and was "going to get rid of this Union, going to get this Union out of this shop one way or another." On another occasion, with reference to the hiring of a son of one of the employees, the superintendent is claimed to have stated that inasmuch as the employee making the request was a member of the Union, as well as his wife, the son would be for the Union, too, and the superintendent couldn't use him. During the 1938 strike, according to the testimony of an employee, one of the "foreladies" telephoned her and urged her to abandon the strike and leave the Union; and on her refusal, warned: "We might all be sorry for this some day." Another employee, on returning to work after the strike, was interrogated as to her Union membership by the same supervisory employee, and when she admitted that she had joined the Union, was told that she "ought to get herself kicked"; and after another employee had come to work for the new company, the same forelady asked her if

she wasn't sorry she joined the Union. It was further testified, on behalf of the Board, that when one of the women employees, who had been given a job in the new bakery company, was leaving the plant for the day, foreman Cleary asked her if she knew that the Union had planned a meeting that afternoon, and when she hesitated to reply, he said: "Julia, you will have to choose between the meeting this afternoon, working with us, or being on the outside with the rest." An additional fact of considerable significance is that when superintendent Shauf reviewed the applications of former employees for work in the new bakery, he had possession of a list of all of the former employees who were members of the Union. His testimony, however, was to the effect that it was a list which had been furnished to the old company by the Union or the representative of the National Labor Relations Board, to give the company information so that it could replace Union men, who had quit work, with other Union members, in accordance with the Union contract.

In the bakery division of the former company, there were employed 107 non-supervisory employees, a majority of whom were members of the Union. In the new company, as a result of the refusal to employ the workers in question, it would appear that the Union majority was reduced to about a quarter of those employed. It is contended by the company that the leading members of the Union were re-employed; but evidence discloses that among such so-called leading members, was the president of the Union, who felt that the Union should be disbanded because he feared that many of the members would not get their jobs back, and that the Union would not have a majority in the new company; and because of this attitude, stated to other employees that they should go and tell the president of the company that they would "co-operate with him in anything that he wants done."

■ Reasons given by the company for failure to rehire the employees in question, were based upon grounds applicable to various of the workers—that certain of them had bad characters, others, bad tempers, or were immoral, dirty, troublesome, disgruntled, too old, or that they had stated that they were not going to take the re-employment. In certain instances, these claims appear credible and persuasive. But such testimony was disputed, and it is not

the province of this court to draw different inferences or conclusions from the testimony than those drawn by the Board, if it be supported by substantial evidence. Likewise, the credibility of witnesses is for the Board, and we find no basis for interfering with its conclusions relating thereto.

From a consideration of the foregoing, we are of the opinion that the conclusions of the Board, finding discrimination and unfair labor practices, in the refusal to employ the former bakery workers who were members of the Union, were supported by substantial evidence. From the statements of the officials of the old company, the identity of leading officers and officials of the new and the old companies, the continuance of the same superintendent and supervisory force, the evidence of bias against the Union, and the fact that only Union members were refused employment, we cannot say that reasonable inferences could not be drawn by the Board that respondent Chattanooga Bakery, Inc., was guilty of the practices alleged. The order, as far as it required the reinstatement of the fifteen employees, who went on strike because of the discrimination in the employment of the other workers, was proper under the Board's findings. National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381.

It is unnecessary to review at length the law governing this controversy, as it has on numerous occasions been clearly and repeatedly announced by the Supreme Court and this court. "Discrimination against union labor in the hiring of men is a dam to self organization at the source of supply." Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 848, 85 L.Ed. 1271, 133 A.L.R. 1217. The company is responsible for discrimination practiced by the personnel committee. See H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; Consumers Power Company v. National Labor Relations Board, 6 Cir., 113 F.2d 38. The disproportionate treatment of union and non-union workers is evidence of discrimination. National Labor Relations Board v. Bachelder, Receiver, 7 Cir., 120 F.2d 574; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. The order to cease and desist was proper. See National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Triplex Screw Co. v. National Labor Relations Board, 6 Cir., 117 F.2d 858; National Labor Relations Board v. Niles Fire Brick Co., 6 Cir., 124 F.2d 366. Remedial pay is allowable to victims of discrimination. See Phelps Dodge Corp. v. National Labor Relations Board, supra. On the question of reinstatement of the striking employees with pay, see National Labor Relations Board v. Mackay Radio & Telegraph Co., supra; Republic Steel Corporation v. National Labor Relations Board, 3 Cir., 107 F.2d 472.

The evidence with reference to the employee, William Sellars, is indefinite and inconclusive as to whether he was a member of the Union, and as to him, the petition is referred to the Board for the taking of further evidence, and supplemental findings and order.

Pursuant to the authority of the case of Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6, the order of the Board should be and is directed to be amended, by striking from paragraphs 2(b) and 2(d) thereof, the following language: "Deducting, however, from the amount otherwise due to each of them, moneys received by him or her during said period, for work performed upon Federal, State, county, municipal, or other work-relief project, and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments, which supplied the funds for the said work-relief project."

Other questions raised, we deem to be not meritorious.

Subject to the foregoing modifications, a decree will be entered, granting enforcement of the order of the Board.

SWINFORD, District Judge, dissents.