## NATIONAL LABOR RELATIONS BOARD v. SUN SHIPBUILDING & DRY DOCK CO.

### No. 8106.

Circuit Court of Appeals, Third Circuit.

Argued Dec. 11, 1942.

Decided March 31, 1943.

---

[1] Cf. National Labor Relations Board v. Brown Paper Mills, 5 Cir., 108 F.2d 867.

David Findling, of Washington, D. C.
(Robert B. Watts, General Counsel, Ernest
A. Gross, Associate General Counsel, Ger-
hard P. Van Arkel, Asst. General Counsel,
and Sanford H. Bolz, Attorney, National
Labor Relations Board, of Washington,
D. C., on the brief), for petitioner.

Sylvan H. Hirsch, of Philadelphia, Pa.
(Joseph S. Conwell, Robert John Brecker
and Pepper, Bodine, Stokes & Schoch, all
of Philadelphia, Pa., on the brief), for re-
spondent.

Guy W. Davis, of Chester, Pa., for inter-
venor, Sun Ship Employees Ass'n.

Before MARIS, JONES, and GOOD-
RICH, Circuit Judges.

JONES, Circuit Judge.

This matter is here on the petition of the
National Labor Relations Board for a de-
cree enforcing its order against the re-
spondent, the Sun Shipbuilding and Dry
Dock Company, entered in a complaint pro-
ceeding instituted upon charges filed by the
Industrial Union of Marine and Shipbuild-
ing Workers of America, a C.I.O. affiliate
(hereinafter referred to as the "Union").

The order is based upon the Board's
conclusions that the respondent was guilty
of unfair labor practices as defined by
Sec. 8 (1), (2) and (3) of the National
Labor Relations Act, 29 U.S.C.A. § 158
(1–3), in that it (1) interfered with, re-
strained and coerced its employees in the
exercise of their right to self-organization
as guaranteed by Sec. 7 of the Act, 29 U.S.
C.A. § 157; (2) dominated and interfered
with the formation of the Sun Ship Em-
ployees Association, an unaffiliated union
(hereinafter referred to as the "Associa-
tion"); and (3) discriminated in regard
to the hire and tenure of five employees for
the purpose of discouraging membership in

the Union and of encouraging membership in the Association. The order directs the respondent to cease and desist from the unfair labor practices found and to take affirmative action (a) by withdrawing recognition from the Association as the representative of any of the respondent's employees and by disestablishing it as such representative; (b) by offering reinstatement to and making whole four of the five employees found to have been discriminated against; and (c) by posting notices of intention to comply, etc.

The respondent has answered denying its guilt of the unfair labor practices found and praying that the Board's order be not enforced. No jurisdictional question is involved, the parties having stipulated in advance of the hearing that the respondent's business is such as to make it amenable to the provisions of the Act within the intendment of Sec. 2 (6) and (7), 29 U.S.C.A. § 152 (6, 7). The Association, which was granted leave by the Board to intervene and thereafter participated in the hearing upon the complaint, has also filed an answer to the pending petition in which it denies that it was dominated, influenced or assisted by the respondent and prays that the order be denied enforcement in respect of the disestablishment provision.

 Among the Labor Board cases which have come to our attention this case appears to be *sui generis*. The Board's findings disclose that the Association, which the respondent is ordered to disestablish as bargaining agent, was the choice of a substantial majority of the respondent's employees expressed by secret ballot at a consent election conducted under the supervision of the regional director of the National Labor Relations Board pursuant to the rules and regulations of the Board and whereat the Association and the now complaining Union were the nominees. No other instance has been brought to our attention where the Board has seen fit to disestablish a bargaining agent which was the duly certified choice of a majority of the employees in a designated unit as the result of an election conducted by the Board. This is by no means intended to imply that the Board may not disestablish a bargaining representative so chosen and so certified. Of course, where the unfair labor practices are committed after the certification of the bargaining agent, they may quite appropriately require the disestablishment of the certified agent. See Humble Oil & Refining Co. v. National Labor Relations Board, 5 Cir., 113 F.2d 85, 88. And even where the practices complained of have occurred before the certification, if the Board in the exercise of its discretion deems disestablishment to be an appropriate remedy under the circumstances, its right so to order may be conceded. But, manifestly, the possibilities inherent in the exercise of such power, upon a complaint filed long after a theretofore unquestioned certification and for matters which allegedly occurred in the formation of the bargaining agent prior to the election, are so vast in their implications as to require an especially detailed scrutiny of the evidence in order that it may be determined with reasonable certainty whether the findings whereon the Board directs disestablishment in such circumstances are justified. After all, the fundamental purpose of the Act is to secure to employees, entitled to its protection, the right to bargain collectively through representatives of *their* own choosing. Obviously, therefore, once a majority choice has been competently polled and authoritatively certified, it is not to be avoided lightly. Otherwise, the employees' right may actually be infringed and the purpose of the Act thereby thwarted.

The consent election in this instance was held on March 19, 1937. Of the total of 3,836 ballots cast, from among the whole of the respondent's then approximately 4,200 employees, there were 2,398 votes for the Association, 1,412 for the Union and 26 blank, void or challenged ballots. The result was promptly (March 22, 1937) certified by the regional director of the Labor Board to the employer, to the Association and to the Union. Thenceforth the respondent dealt[1] with the Association as the

---

[1] Shortly after the regional director's certification of the result of the election, the respondent and the Association entered into negotiations and reached an oral agreement in the presence of representatives of the Labor Board with respect to wages and other conditions of employment applicable to all hourly workers in the respondent's plant. On December 31, 1937, the respondent and the Association entered into a written contract wherein the Association was recognized as the exclusive representative of all workers of the respondent employed upon an hourly or piece-work basis and which contained numerous and appropriate provisions concerning wages, hours and other conditions of employ-

bargaining agent of its employees without objection from any one until the filing of the current charges by the Union on January 15, 1940, almost three years later.

In substantial part, the charges relate back to the formation of the Association and other matters antecedent to the election. And, on the basis of those charges the Board finds the respondent guilty of unfair labor practices in the particulars specified. Aid in the administration of the Association subsequent to the election was also charged and found. But, as to that, it should be borne in mind that, following the official and unimpeached certification of the Association as a result of the election, no other course was open to the respondent (if it was to comply with the requirements of the Act) than to bargain with the Association as the collective representative of its employees. Certainly, such was the case at least so long as the Association's majority status was not competently overthrown and its integrity remained otherwise unquestioned.

The Association was the direct outgrowth of a back-to-work movement by 2,200 non-striking employees in the face of a picket line then being maintained by members of the Union which was conducting a strike at the respondent's shipyard. The strike began on December 7, 1936, when from 900 to 1,000 employees, who were members of the Union, walked out because of a jurisdictional dispute, and wholly without relation to any complaint as to the wages, hours or conditions of employment obtaining at the respondent's plant. As the Board found, the production workers were prevented, because of the mass-picketing tactics of the strikers, from entering the respondent's premises. Consequently, all work thereupon ceased. For a description of what then ensued we quote directly from the Board's findings as follows:

"Since the non-union employees were anxious to return to work, feeling ran high and the situation became more tense as on December 8, 9, and 10, the union members continued to prevent ingress to the shipyard. In fact, on December 9 and 10, a clash was avoided only when Richard L. Burke, the respondent's vice president and general manager, acting on orders from the respondent's president, John G. Pew, Sr., advised the employees not to break through the picket line as the respondent was attempting to work out a peaceful solution with the Union. On December 10, Burke reported to Pew that 'this is the second time I have been up there. Those people are going to force this issue. Many of the men have declared that they are going to come back tomorrow—to me it looks serious.' That evening Burke instructed the three superintendents who had supervision over various sections of the shipyard, 'By all means to keep out of any movement the next day, that it was going to be serious.' On the morning of December 11, about 2,200 employees, representing all 3 shifts * * * gathered behind the pickets. Although forewarned, the respondent's officials on this occasion made no attempt to disperse its employees who broke through the picket line and succeeded in entering the shipyard. In the ensuing riot many were injured, some seriously."

The implication contained in the above-quoted finding that the respondent's officials made no attempt to disperse the non-striking workers who, desiring admission to their place of employment, broke through the picket line could not have been intended to fasten responsibility in such regard upon the respondent. As the finding indicates, the "break-through" proved to be as serious in accomplishment as it had been ominous in prospect.[2] Moreover, the Board expressly found, in this same connection, that "There was no evidence * * * to indicate that

---

ment. The agreement further provided that it should be operative for a term of one year and should thereafter remain in force and effect until terminated by either party's giving to the other sixty days written notice of intention to terminate. See Matter of Sun Shipbuilding and Dry Dock Company, 14 N.L.R. B. 292, 294. On January 18, 1940, the respondent and the Association entered into a new written contract. This contract, which was for a one year term, subject to automatic renewal unless notice to terminate was given by either

party, likewise recognized the Association as the exclusive bargaining representative of the respondent's employees.

[2] Four hundred forty employees suffering from tear gas and wounds from gas containers were given first aid within the plant. Sixty-four "who had teeth knocked out, scalp wounds, and bruises of different kinds" also received first aid. Twenty more were sent to the hospital, among whom were two whose injuries were so serious as to seem for a time as likely to be fatal.

any of the strikers were solicited to return to work nor did the respondent in any other way interfere with the lawful activities of the strikers. While * * * several supervisory employees of the respondent capitalized upon the desire of the non-striking employees to return to work by encouraging and aiding them in breaking through the picket line, we find that these activities of the respondent [sic], without any other evidence of interference with the rights of the strikers, did not constitute such interference, restraint, and coercion as is prohibited by the Act."

Having gained admission to the shipyard by breaking through the picket line on December 11, 1936, the non-striking employees thereupon resumed work. The strikers returned to work approximately two weeks later (December 28) upon the respondent's promise to meet with the Union between January 1 and 15 "to discuss and attempt to agree upon the terms and conditions of employment."

Commencing on the day the non-striking employees resumed work and for several days thereafter, petitions were circulated among the employees for signature. The petitions carried a heading expressing the desire of the undersigned to appoint and maintain their own representatives to discuss and settle all working arrangements with the company and requesting the company to deal with them exclusively rather than with any minority organization. The petitions, which, for the most part, were in identical mimeographed form, were circulated among the employees of the three shifts during working hours and lunch time. The respondent contended that it had nothing to do with the preparation and circulation of the petitions and was ignorant of their existence until December 28, 1936, when, containing about 2,600 signatures, they were placed upon (company president) Pew's desk. The Board expressly refrained from finding, as had the trial examiner, that the petitions in fact originated with the respondent. But the Board did find that, because of the participation of three supervisory employees in the cir-

culation of the petitions for signatures, the respondent was aware of their existence and their wide-spread circulation throughout the plant during working hours and that the respondent's failure, in the circumstances, to denounce the petitions was tantamount to permitting and condoning their being circulated and signed.[3] Some other supervisors, including one assistant foreman, signed but did not circulate petitions.

■ The three supervisory employees whom the Board identifies as circulators of the petitions were what are known as "leaders" (Bradley, Fitzsimmons and Dixon). A "leader" does manual work and receives pay at an hourly rate. In addition to his own work he watches over the work of the other employees in his immediate group. His control over their tenure is limited to recommending discharge for certain types of offenses, such as drinking, sleeping on the job and fighting. He can also recommend promotion. But a "leader" is sufficiently detached from management so as to be eligible to organize with other employees for collective bargaining purposes, and both the Association and the complaining Union admitted, and still do admit, such employees ("leaders") to membership. The fact that the duties of the "leaders" exceeded those of ordinary employees is not of itself sufficient to fix the respondent with responsibility for the petitions merely because it did not act affirmatively to prohibit and prevent the circulation and signing when its knowledge of their existence could not be directly shown but rested entirely upon imputation. It will be found that, where the condemned activities of minor supervisors (e. g. "leaders") have been charged against the employer, there was present at least some evidence of open or covert opposition or hostility on the part of the employer to employee self-organization or to a particular union or favoritism of another. Cf. International Association of Machinists, Tool and Die Makers Lodge No. 35 v. National Labor Relations Board, 311 U. S. 72, 78, 80, 81, 61 S.Ct. 83, 85 L. Ed. 50. The relevancy of the employer's

---

[3] The Board concedes that "some solicitation by the Union also took place on company time" but immediately extenuates for that by finding that the Union's solicitation "was carried on sporadically and more or less covertly, and not in an open, bold manner or with the magnitude and intensity of the Association's activities",—an observation, by the way, which belies the reason assigned for the belatedness of the charges when it is recalled that more than 1,400 members of the Union were present in the respondent's plant and must have witnessed any manifestation of Association activity.

attitude towards unions was expressly noted in National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 588, 61 S. Ct. 358, 85 L.Ed. 368. In that case, the employer's attitude to unions was hostile, but the attitude can be no less relevant where it is favorable to employee freedom in the matter of self-organization.

In the same way, the fact that petitions were circulated and signed on company property and on company time, immediately following the resumption of work by the nonstriking employees, is of more or less significance in fastening responsibility upon the employer, on the basis of presumed knowledge, depending upon the employer's exhibited attitude and conduct in respect of its employees' right to free and untrammeled self-organization. See National Labor Relations Board v. Algoma Plywood & Veneer Co., 7 Cir., 121 F.2d 602, 605; also Quaker State Oil Refining Corporation v. National Labor Relations Board, 3 Cir., 119 F.2d 631, 632, where we said that in making "an analysis of the evidence in a case such as the one before us the evidence relied on by the Board should be considered in the light of the general background of labor conditions prevailing in the [employer's] plant". And again in National Labor Relations Board v. Swank Products, Inc., 3 Cir., 108 F.2d 872, 875, where supervisory employees had been active in organizing an independent union and meetings for that purpose had been held on company property and on company time, this court ruled that such circumstances, of themselves, were insufficient to afford an inference of domination by an employer which was not shown to have been hostile to labor unions and which had accorded to its employees freedom of choice in respect of their representation affiliations. See also Ballston-Stillwater Knitting Co., Inc. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 761.

The record in the instant case discloses that, at all times up to the formation of the Association, the respondent (which had been incorporated in 1916) had uniformly accorded to its employees the unrestricted right to bargain collectively either through affiliated or unaffiliated organizations of their own choosing. By March 1919 approximately eighty-five per cent. of the respondent's employees were members of various craft unions affiliated with the American Federation of Labor. By agreement between those unions and the respondent, machinery was set up for the presentation and adjustment of disputes and grievances through the medium of a Joint Crafts Committee composed of delegates from each craft union. In 1922 work became slack, membership in the unions fell off and the unions began to disintegrate. Because of this and as a result of a conference between employee representatives and the respondent, a yard committee composed of departmental representatives of employees was then set up for the purpose of dealing with the management. Under the arrangement each department had a shop committee composed of three employees chosen for a specified term by and from among the employees in the particular department. The membership of the General Yard Committee was made up of a representative from each of the shop committees, likewise chosen for a specified term. The company had neither voice in the selection of committee members nor management representation on the committees nor power of veto over changes in the constitution or administration of the representative committees. So, without interference or domination from the employer, the General Yard Committee acted uninterruptedly as the sole bargaining representative of the employees until 1933. In that year, the Federal Labor Union, an A. F. of L. affiliate, secured memberships among the respondent's employees. Some of the members left that union in 1934 and together with employees of another shipyard formed the now complaining Union, which was unaffiliated at that time but subsequently became affiliated with the C. I. O. The functions of the yard committee were gradually absorbed by the Federal Labor Union (A. F. of L.) and by the Union (C. I. O.), both of which operated without molestation from the company.[4] And, what is of particular importance here, the Board expressly finds that "There is no evidence that the General Yard Committee continued to exist after the effective

[4] In 1935 the Industrial Union of Marine and Shipbuilding Workers of America, of which the charging Union in this case is a local, and a representative of the New York Shipbuilding Corporation jointly chose Pew, the respondent's president, as third member of a board of arbitration for the settlement of a labor dispute between the parties to the arbitration.

date of the [National Labor Relations] Act." The case, therefore, does not present a situation which requires of the respondent an affirmative showing of a positive break with a past course of interference in its employees' exercise of their rights. There had been no such past, and even the Yard Committee, which is not alleged to have been company-dominated, had been definitely terminated by the time the National Labor Relations Act became effective, as the Board categorically found. Cf. National Labor Relations Board v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39, 49; National Labor Relations Board v. Condenser Corporation of America, 3 Cir., 128 F.2d 67, 73; Roebling Employees Ass'n, Inc. v. National Labor Relations Board, 3 Cir., 120 F.2d 289, 295; Westinghouse Electric & Manufacturing Co. v. National Labor Relations Board, 2 Cir., 112 F.2d 657, 659, aff'd per curiam, 312 U.S. 660, 61 S.Ct. 736, 85 L.Ed. 1108. We come then to the formation of the Association.

Following the signing of the petitions after the return to work on December 11, 1936, the employees in the various departments elected representatives, who met in scheduled meeting on January 4, 1937, for the purpose of organizing. The name of the organization was selected, by-laws were adopted and officers were elected. The meeting took place in the welding shack on the company's property at 4:30 p. m., at the end of the first shift. The Board finds that representatives from the second shift who were scheduled to start work at 4:30 p. m. attended the meeting without loss of pay.[5] Here, again, because of the employer's aloofness from its employees' organizational activities, the implications from their meeting on company property were slight and manifestly were not sufficiently serious to provoke charges against the employer prior to the election and the certification of the Association.

On the day succeeding the organization of the Association (January 5th), it re-quested by letter a meeting with the respondent on January 7, 1937, which was granted. After listening to the Association's demands, which included a request for an increase in wages, Pew, the respondent's president, told the Association's representatives that he could not give them any decisions for a day or two and, having shown them the rates of pay at other yards, stated that when others raised wages the respondent would also, but that it could not do so then.

Pursuant to Pew's undertaking of December 28 (when the strikers returned to work) to meet with the Union's representatives between January 1 and 15, such a meeting was held on January 11. The Board finds that Pew talked more sympathetically and responsively to the representatives of the Association than he did to the representatives of the Union.[6] However that may be, the indisputable and over-all fact is that he neither recognized nor dealt with either organization. The Union's representatives on their part had presented a proposed contract for the respondent's execution and, in addition to other demands, had requested recognition of the Union as the exclusive bargaining agent of the respondent's employees. As a result of the conflicting claims as to which of the two organizations actually represented a majority of the employees, the consent election was agreed upon and held on March 19, 1937, under Board auspices, with the result as already stated.

So far we have reviewed the facts and findings with special reference to the back-to-work movement and the breaking of the picket line (for which the Board exonerates the respondent of responsibility), the signing and circulation of the petitions and the formation of the Association to the extent that such matters were unquestionably known at the time of the consent election to the respondent's employees in general, more than 1,400 of whom were members of the Union as the election shortly afterwards revealed. The fact that the Union then voluntarily en-

---

[5] Customarily and continuing down to the hearing in this case the respondent had also met from time to time with a grievance committee of the now complaining Union on company time and without loss of pay to the committee members.

[6] The Board finds that at the meeting on January 7, 1937, Pew, in responding to the Association's representatives, said, "I do appreciate your loyalty, boys. I cannot for a day or two, give any decisions, but I am going to deal with our own employees * * * Do what you think is right, boys, and we will deal with you. I want you to tell your men that I have shown you the rates of the other yards and when others raise wages we will do so, but we just cannot do it now."

tered upon the election and for three years thereafter acquiesced in the result only serves to confirm what the record, up to this point, indisputably shows, viz., that there was no substantial evidence of employer domination or interference in the formation of the Association.

In support of its findings of unfair labor practices in the formation and administration of the Association, the Board relies upon additional evidence as to matters alleged to have occurred before, during and after the election, to which reference needs be made in material part. The additional evidence is derived almost in its entirety from the testimony of one Lewis A. Campbell, an employee of the respondent. Campbell, now a member of the Union, alleges that while he was a member of the Association, he committed unfair labor practices in collusion with the respondent in order to advantage the Association. It was on the strength of Campbell's allegations that the Union filed the current charge.

 The respondent argues, *in limine,* that the Board should have dismissed the complaint on the ground that the charges came too late and that, in failing so to do, the Board erred. In support of this contention the respondent cites the case of Interlake Iron Corporation, 33 N.L.R.B. 613, 626, 627. There, as here, the association (the independent organization) had been chosen as the bargaining agent of the company's employees over the complaining union by a majority vote at an election conducted by the Board. Further, as found by the Board in that case, "officials and supervisory employees of the respondent made numerous statements during the Association's organizational campaign in favor of the Association and in opposition to the Union." Nevertheless, the Board refused to order disestablishment of the independent union in the Interlake case.[7] In so acting, the Board (p. 627) deemed it "highly significant that the Union, the officials of which were in close touch with the respondent's employees, accepted the Association as an election rival and allowed its certification without once raising the issue of the respondent's domination or support of the Association, or of the Association's capacity to act as collective bargaining representative of the employees." The Board also noted in the Interlake case that the Union had filed no charge of domination or support of the Association for a year after the certification and two years after the Association's inception. In the instant case, where the Union's touch with the respondent's employees was no less close, the period of its acquiescence in the certification had been even longer (three years). The action which the Board thereupon took in the Interlake case it could have taken with equal propriety in this case. But it did not do so and, in final analysis, the matter was for the Board's discretion. We are unaware of any rule of law which would justify a court in saying that, because charges are belated, the Board abuses its discretion when it refuses to dismiss a complaint for that reason. Our appropriate inquiry is whether the Board's findings are supported by evidence.

As already stated, the additional evidence relied upon by the Board comes almost entirely from the testimony of Campbell. A reading of the Board's findings and decision will readily so confirm. In fact, the implication to that effect is plain, wherein the Board states that " * * * most of the evidence pertaining to the respondent's unfair labor practices was not available until Campbell had revealed his collusion with the respondent * * *."[8]

---

[7] See also In the Matter of Hope Webbing Company, 14 N.L.R.B. 55, 75; and In the Matter of Wickwire Brothers, 16 N.L.R.B. 316, 325. The cases contra are not in point here. In Magnolia Petroleum Co. v. National Labor Relations Board, 10 Cir., 115 F.2d 1007, 1013, it will be noted that the order to disestablish expressly excepted two districts (Cushing and Graham) wherein the Board had theretofore supervised consent elections. And as to In the Matter of Wilson & Co., Inc., 31 N.L.R.B. 440, 448-456, the representative organizations there disestablished were but a continuation of the familiar and, for a time, prevalent "employee representation plan" (see Roebling Employees Ass'n, Inc., v. National Labor Relations Board, supra, 3 Cir., 120 F.2d at p. 290), under which the employer paid all organization bills, had the right of veto over changes in the by-laws and had management representatives on the governing body. In other words, the successor organization in the Wilson case was little more than a new name for an old company union.

[8] As to the means of information available to the Union long prior to Campbell's allegations, see footnote 3 ante.

This was said by the Board in pointing out that "such disclosure did not take place until after both the consent election in 1937 and the pattern makers election in 1939." [9]

Campbell was employed by the respondent as a boiler maker, and still is. His first employment identifiable from the company's records was in 1932 under the name of James Campbell (the name of a brother), which Lewis Campbell admittedly took in order to confuse his identity upon seeking employment and which he continued to use until 1936. According to Campbell, he first obtained employment with the respondent in 1922. But, as neither his own nor his brother's name appeared on the company's records as identifying an employee prior to 1932, he was asked on cross-examination whether he had originally obtained employment under a fictitious name, and he said he was unable to recall. Likewise when asked whether he had sought employment at the respondent's yard in 1925 as "Malcolm Hastings", he was unable to recall but would not say that

he had not done so. In any event Campbell has been an employee of the respondent since 1932, under the name of James Campbell from 1932 to 1936 and since 1936 under his own name.

During Campbell's employment by the respondent his labor affiliations have been varied. In 1933 he joined a union but is unable to say what the organization was. A little later in the same year he joined the Industrial Union of Marine and Shipbuilding Workers, then unaffiliated but later a C. I. O. affiliate, and now the complaining Union in this case. He "stepped out" of that union in 1935 because of "an argument with the officers that run the organization". He sought reinstatement in the Union in 1936 but, lacking the money "to get back into the fold", he "didn't re-affiliate * * * at that time". When the strike occurred a little later (December 1936), he became a leader in the back-to-work movement and thereafter took an active part in the formation and administration of the Association. He became a member of the Association's board of

---

[9] The "pattern makers election in 1939" refers to an election which the Board conducted on August 22, 1939, among the respondent's pattern makers, of whom there were 29. The election was had in a representation proceeding under Sec. 9(c) of the Act, 29 U.S.C.A. § 159(c), upon the petition of the Pattern Makers' Association of Philadelphia and Vicinity (an A.F. of L. affiliate), which claimed to have as members a majority of the respondent's 29 pattern makers. See In the Matter of Sun Shipbuilding and Dry Dock Company and Pattern Makers' League of North America, 14 N.L.R.B. 292. The Association as well as the Union (C.I.O.) resisted the application for the certification of a representative of the pattern makers as a separate unit on the ground that the past bargaining history of the respondent's employees did not indicate the appropriateness of constituting the pattern makers a separate bargaining unit. The Board, in its decision of August 7, 1939, in the representation proceeding, after hearing therein and investigation thereof by the regional director, found that "The record also shows that a considerable number of pattern makers participated in the consent election of March 19, 1937", and again noted that the Association had "received a large majority of the votes cast at the election held on March 19, 1937, among

the hourly and piece-work employees." None the less, the attorney for the Association stated in oral argument before the Board at the hearing on the petition for the representation proceeding that the Association "had no objection to an election among the pattern makers to determine their desires with respect to representation and to establishment of a separate unit if a majority of the pattern makers indicated at an election that such was their desire." (See 14 N.L.R.B., supra, at p. 296.) The Board thereupon ordered an election, which was held by the acting regional director on August 22, 1939. The result, as certified by the acting regional director, was that of 29 employees (pattern makers) eligible to vote, 28 had voted. Of the votes so cast the Pattern Makers' Association received 13 votes and the Association 14 votes, the one remaining ballot having been challenged. On objections filed by the Pattern Makers' Association to the election report, the objections, after investigation thereof by the acting regional director, were overruled by the Board and the petition of the Pattern Makers' Association for the certification of a separate bargaining representative for the pattern makers was dismissed. See In the Matter of Sun Shipbuilding and Dry Dock Company and Pattern Makers' League of North America, 15 N.L.R.B. 771, 772.

strategy[10] and its chief investigator of grievances,—a position which gave him an opportunity to roam the respondent's yard. As his own recitals serve to indicate, he was a person of importance to the labor relations existing in the respondent's plant. In the latter part of August 1939, the other members of the strategy board voted to expel him from his membership on the board and to abolish his post as investigator of grievances. The strategy board gave as the reason for their action that they had discovered that Campbell was betraying the Association by trying to bring the A. F. of L. into the yard. As appears from the Board's findings,— "James Preston, a member of International Brotherhood of Electrical Workers, affiliated with the A. F. of L., testified that on several occasions in 1938 and 1939 Campbell discussed with him the possibility of organizing the respondent's employees as an affiliate of the A. F. of L." At the succeeding monthly meeting (September 1939), following Campbell's expulsion from the strategy board, he resigned from the Association. A little later, the Union, whose local had had its charter lifted by the parent organization in the spring of 1938, began an organizational campaign among the respondent's employees and Campbell became a member of the Union at the first meeting of the re-established local on December 11, 1939. Approximately one month later (January 15, 1940) the Union, on the strength of Campbell's allegations, filed the charges with the Board whereon the present complaint issued.

 It is our duty to accept as conclusive such of the Board's findings of fact as are supported by evidence. National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 208, 60 S. Ct. 493, 84 L.Ed. 704. Section 10(e) of the Act, 29 U.S.C.A. § 160(e), so requires. The term "evidence" as used in this connection means "substantial evidence", that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126), and affords "a substantial basis of fact from which the fact in issue can be reasonably inferred" (National Labor Relations Board v. Columbian Enamel-

ing & Stamping Co., 306 U.S. 292, 299, 59 S.Ct. 501, 505, 83 L.Ed. 660). See also Quaker State Oil Refining Corp. v. National Labor Relations Board, loc. cit. supra, and Martel Mills Corporation v. National Labor Relations Board, 4 Cir., 114 F.2d 624, 627-629. While it is for the Board, therefore, to find the facts and to draw material inferences from the evidence (National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307), it is for a reviewing court to say whether the Board's findings are supported by substantial evidence and whether its conclusions are reasonably inferable from the evidence which it accredits. Guided by these standards, it is our opinion that the Board's findings of unfair labor practices on the part of the respondent are not supported by substantial evidence.

 In reviewing the evidence upon which the Board relies for its findings it is also necessary for us to keep in mind that it is the province of the Board, as the fact-finder, to resolve the conflicts in the testimony and to appraise the credibility of the witnesses. See National Labor Relations Board v. Condenser Corporation of America, supra, 3 Cir., 128 F.2d at p. 78. However, in determining whether the evidence which the Board accredits is such "as a reasonable mind might accept as adequate to support a conclusion", it is not wholly without significance that the integrity of the principal witness relied upon by the Board was self-impeached, that he had a bias or interest to serve for which both the Examiner and the Board felt constrained to make allowance in appraising his testimony, and that the Board itself disregarded material portions of his testimony on certain issues where directly refuted.

In support of the charges that the company dominated and interfered with the formation of the Association, Campbell had testified to a number of matters calculated to show that the company had instigated the back-to-work movement and the breaking of the picket line, had encouraged physical resistance of the strikers by the employees who returned to work on December 11, 1936, had initiated the petitions as well as having prompted their circulation for signature, had abetted the hasty

---

[10] The strategy board was composed of the association's three executive officers and five chairmen, one of whom was Campbell.

formation of the Association on December 15, 1936, within four days of the non-striking employees' return to work and had paid for the membership cards of the Association. Of all these charges, the Board found only presumed knowledge on the part of the respondent that three minor supervisors had circulated petitions, and from that the respondent's approval of their actions was then inferred.

Even accepting that Campbell's admission on cross-examination that the membership cards had been paid for by the Association atoned in a measure for his earlier implication to the contrary, the fact remains that the plain intendment and only purpose of his direct testimony in such regard had been to make it appear that the company had underwritten the cost of the membership cards,—an implication which was disingenuous, to say the least, when he knew, as he admitted on cross-examination· a little later, that the cards had been paid for by the Association. As to the date of the organization of the Association, the Board found that it was organized on January 4, 1937, and not on December 15, 1936 (immediately following the return to work) as Campbell had testified. Nor could this have been a mere mistake in dates on Campbell's part. According to a finding of the Examiner, Campbell possessed a "remarkable memory as to names, dates and minute details", and the Board was apparently of the same opinion. But Campbell's evident anxiety had been to make the formation of the Association appear to have been contemporaneous with the return to work for which he was imputing responsibility to the respondent. Yet, the Board repudiated him as to that very material date. His story that the employees who returned to work on December 11, 1936, spent their time that day in fashioning "Handy-Andies" (a handbilly made of wood) was so completely overwhelmed that, although the matter had loomed large in the complainant's case at the hearing, neither the Examiner nor the Board even mentions the incident and, again, disregarded Campbell's testimony with respect to it. And, as we have already seen, the Board expressly exonerated the respondent of any responsibility for the back-to-work movement and the breaking of the picket line and refused to find that the respondent had initiated the petitions.

As is thus apparent, the only testimony from Campbell in relation to the formation of the Association which the Board actually accepted was the matter of the circulation of petitions by three minor supervisors. And, in that instance, Campbell was corroborated by the witness Monroe, who testified that he had been asked by Bradley, his "leader", to go around among the men with a petition, Bradley saying, according to Monroe, that he had been sent out from the office to ask Monroe to do that. However, the Board did not accept Monroe's direct testimony (hearsay, of course, but permissible none the less under the Act) that the company had actual knowledge of or an interest in the petitions. The Board's limited finding shows that it accepted Monroe's testimony only to the extent that he had been asked by Bradley to circulate a petition. Incidentally, Monroe refused so to do and did not suffer as a consequence. We have already dealt with the inefficacy of the meagre finding, regarding the circulation of the petitions, as support for an inference of culpable knowledge on the part of the company when uncoupled with other evidence of employer hostility to bona-fide collective bargaining. This is especially so, when the matter must have been known generally at the time, long prior to the consent election, and no charges of unfair labor practices on that account were then made. There is therefore no evidence in the case to support a finding or reasonable inference of company domination. or interference in connection with the formation of the Association.

It could serve no useful purpose to review in detail all of the matters testified to by Campbell in support of the further charge that the company interfered with, dominated and aided the Association in its administration. Standing alone, a number of the incidents which he related could be of little or no significance so far as imputing responsibility to the employer is concerned. Their importance, if any, lies only in association with and depends upon the probative value of Campbell's more serious assertions, which we shall now consider for the purpose of determining whether they constituted substantial evidence and reasonably supported the inferences which the Board drew.

In 1937, the company changed from riveting to welding in its ship construction. For that purpose it instituted a school for the instruction of welders. According to Campbell, he and some confederates, with the approval or, at least,

acquiescence of several supervisory employees in the welding school, rigged the tests against applicants not favorable to the Association so that they would fail of employment. This he did, as he himself testified, by fluctuating the heat, damping the wire, grounding the handles of the electric welders, or by surreptitiously interposing other physical impediments. When asked whether the company's officers knew what he was doing, as he had related it, Campbell said that he had tried on one occasion to tell Burke but that the latter had said that he did not want to know what Campbell was doing. On the basis of that negative testimony the Board inferred that the company had abetted Campbell in obtaining members of the Association by permitting him arbitrarily to defeat, for positions as welders, applicants who were members of other unions or were otherwise hostile to the Association. While it is not for us to resolve the conflicts in the testimony, we note in passing that the supervisory employees in the welding school denied any knowledge that tests had been rigged, and Burke testified without contradiction that when he heard of the insinuations as to Campbell's schemes in the welding school, he gave instructions barring entrance to all persons not having business there (Campbell, a boiler maker, being among the latter). A notice to that effect was posted, which irked Campbell. Moreover, the documentary proofs show that welders were selected from among applicants coming from other yards which Campbell admitted were unionized either C. I. O. or A. F. of L. But, ignoring all of the refutations of Campbell concerning his activities in the welding school, as we necessarily do, his testimony was still insufficient to afford a reasonable inference that the company was responsible for or had ever approved of his reprehensible conduct there.

 Campbell's next serious allegation is that Pew and Burke gave him money in aid or because of his organizational activities for the Association. There were several instances of this. He testified that Pew gave him $200 in 1937 and 1938 to "meet obligations". Pew admitted that he gave Campbell $240 or $250 but said that it was to defray the costs of medical attention for Campbell's eyesight, which was seriously impaired due, as Campbell asserted, to an injury he had suffered in the boiler shop a few years before. Pew had seen Campbell around the plant like any other employee but did not know him by name. When he first perceived Campbell's impaired eyesight, Pew sent him to first aid and then supplied him with the money for medical treatment, a part of which he received at the Johns Hopkins Hospital. The hospital records were offered in evidence and corroborated Pew. Yet, the Board excused Campbell for the impression he had left, when he testified that the money given him by Pew was to enable him to "meet obligations" incurred in connection with his work for the Association, by observing that Campbell could have been asked on cross-examination to state specifically whether or not the money was for the treatment of his eyesight. The matter having been introduced by Campbell, it was for him to make it clear on direct examination and not leave it open for an improper inference. The Board further inferred unjustifiably in favor of the implication created by Campbell when it commented that "Pew offered no explanation as to why Campbell was singled out for such generosity." There was nothing in the evidence from which to conclude that Campbell had been singled out for generosity. Pew had testified that he had made advances to many employees from the time he first started the shipyard; and he was not cross-examined as to any of the other instances for the purpose of testing the verity of that assertion. Actually, the occasion for drawing an inference from failure to cross-examine lay in the latter situation rather than the one to which the Board applied it. However, in the end, all that the Board drew from the testimony relative to Pew's advances to Campbell was that,—"While Campbell may have used the money he received from Pew for the treatment of his eyes, as is evidenced by Pew's testimony and documentary proof that he received treatment at Johns Hopkins at about the time in question, his [Campbell's] failure so to testify cannot be said to brand his testimony as to the loan a deliberate falsehood." So much may be granted. But that does not add certainty to Campbell's indefinite version so as to make it reasonable to infer therefrom, certainly not exclusively, that what Pew gave him was to assist him in his labor activities rather than for the treatment of his eyesight. Even if it were reasonable to infer the former, it was at least no less reasonable to infer the latter. And evidence which equally supports inconsistent inferences is

not substantial. Cf. Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989.

The same may be said for the $50 which Burke loaned Campbell that he might move his living quarters shortly after the formation of the Association. Campbell said that the purpose of his moving was that he might be more centrally located to carry on the Association's campaign for members. Burke said that Campbell had told him that the conditions at his rooming house were unpleasant and that he needed the money to pay up his bills in order to move. According to Campbell, $40 of the $50 loan came directly from Pew in the form of two $20 bills and the other $10 from Burke. But Burke admitted that he had loaned Campbell $50; and Pew denied having given him any part of it. In that situation, the Board studiously refrained from discrediting Pew by expressly declining to find that he had had any part in making the $50 loan and, moreover, must have accepted Burke's testimony (contradictory to that of Campbell) when it found that Burke had made the loan. It was therefore purely arbitrary for the Board to accept Campbell's imputation of motive for the loan while disregarding entirely his disputed testimony as to the factual basis attending the loan. Burke, too, testified that he had loaned money to many employees, including known members of the Union (C. I. O.), two of whom he named. In fact, as the Board found, Burke endorsed a note for Campbell at bank on October 19, 1939, a month after Campbell had resigned from the Association; and Burke paid off that note several months later after Campbell had become a member of the Union. Likewise Campbell's inadequate attempt at accounting for the $200 which he testified Burke had advanced him for expenses in connection with the election, and which Burke denied, was insufficient to show that that money, even if given, was advanced for the purpose which Campbell assigned. Nor did the testimony of the cab driver (Figiniak), that Campbell hired his taxi at different times, amount to corroboration in support of the inference Campbell sought to convey.

That the company had engaged in espionage and surveillance in respect of its employees' exercise of their right to self-organization, as the complaint charges, cannot reasonably be inferred from the evidence. Against the background of ex-hibited company respect for its employees' right to belong to any union they chose or to no union at all, the isolated instances of alleged espionage cited are relatively lacking in significance.

In keeping with a practice Pew had followed for many years, in 1939 he engaged the services of a representative of the Brown Survey Company of Philadelphia to investigate the treatment accorded the respondent's employees by its foremen and to ascertain whether there was drinking, sabotage or theft among the employees. Brown Survey assigned to the work one Reeder who, as the Board finds, was told by Pew that he was to report to Brown "concerning safety in the yard, the efficiency of the employees and the relationship between the surpervisory employees and the workers." That direction, it will be noted, contained nothing concerning the employees' labor affiliations or activities. It so happened that Reeder, the investigator, was "a staunch union [C. I. O.] member". Realizing the opportunity of his advantageous position, Reeder immediately consulted with one Shapiro, "the local organizer for the Union", as to what should be done. Together they agreed that the only way to bring a "legitimate [national] labor organization" into the respondent's yard was to blacken Campbell, who was then active for the Association. According to Reeder, he deliberately set about to do that. Although he had been specifically told by Brown not to investigate or report on union activities, he promptly assumed in his reports to inject such matters, which Brown says he eliminated before turning the reports over to Pew. Pew denied having received any written or oral reports from Brown concerning the union activities of the respondent's employees. The whole thing concerning Reeder amounts to no more than a gratuitous effort by a Union member to exploit a situation at hand to the fullest advantage to his own organization and certainly did not reasonably rise to the point of imputing espionage to the respondent. Reeder voluntarily interpolated the spying observations for his own purposes and not because the employer had either asked for or wanted them.

In addition to the above, the Board finds that Nilon, a former member of the Union and later a member of another organization known as Independent Shipyard Workers, was a "stool pigeon" for Apple-

by, the secretary of the Association.[11] We are unable to find anything in the evidence, either direct or reasonably inferential, to connect the respondent with any activities of Nilon. For that purpose the Board made point of the fact that in September 1938 John G. Pew, Jr., discharged Nilon for sleeping on the job, and that later Pew, Sr., reinstated him, upon complaint by Appleby of the Association. This was patently insufficient to support an inference that Nilon was a spy for the respondent. Pew testified that he reemployed Nilon, when his discharge was brought to his attention, because he never discharged any one himself and he did not want his son to do so.

In the case of Ryan, a member of the Union, who at Campbell's instance attended a Union meeting on the eve of the election in March 1937 to see how many members were present, the evidence was likewise insufficient to support an inference of company interest or concern. Ryan's testimony as to the telephone conversation, when he was with Campbell, who, upon receiving a telephone call, held the receiver between himself and Ryan so that the latter could also hear, did not corroborate that the man whom Campbell addressed as Mr. B. was Burke, the respondent's vice president, whom Ryan did not know.

In our opinion none of the foregoing circumstances furnishes a reasonable inference that the respondent spied upon its employees' labor activities. With several labor organizations then flourishing in the plant simultaneously, it is noteworthy that the respondent is not charged with the disparagement of any. This, we believe, will be the more apparent when we come to consider the alleged discriminatory discharges.

The story of Campbell's strong-arm squad fails to tie responsibility therefor on the respondent. That Campbell organized such a group we necessarily accept because the Board so found from his testimony. But there were no outward evidences of its existence. Nor is it alleged that it was ever used to aid the Association or to thwart the Union or otherwise to coerce the employees. Admittedly, it was never called into action. So that even accepting Campbell's word that it did exist, there is nothing to justify an inference that the company was responsible for it or that that instrumentality had either the company's approval or even its acquiescence.

In the light of the foregoing, we deem it unnecessary to review in further detail the remaining matters testified to by Campbell, all of which involve his own personal and, ofttimes, secret conduct of as long ago as four years before the hearing at which, for the first time, he revealed the character and extent of his allegations and for which he would now make the company responsible on the basis of his alleged collusive understanding and arrangement with the respondent. The fact that from the very nature of the evident situation an answer in detail to testimony so advanced is difficult and, at times, impossible should not be availed of as inferential confirmation that the testimony is substantial. Especially in such circumstances, the inherent probative value of the testimony remains a question of primary concern.

We come then to the matter of the alleged discriminatory discharges. The charge which the Union filed in this case on January 15, 1940, alleged, inter alia, that since December 11, 1936, the respondent had discouraged membership in the Union and had encouraged membership in the Association by discriminating in regard to the hire and tenure of employees. Notwithstanding that the Union was a strong competing organization of roundly one thousand members on December 7, 1936, as indicated by the number who went out on strike, and of over fourteen hundred members three months later (March 19, 1937), as disclosed by the election, the charge specified but a single instance of discriminatory discharge, viz., that of Chester A. Faunce, who was alleged to have been dismissed from the respondent's employment on December 29, 1939 "because of his membership in, and activities on behalf of the Industrial Union of Marine and Shipbuilding Workers of America." After the charge had been filed and investigated preliminary to the issuance of a

---

[11] Appleby later affiliated with the American Federation of Labor, of which he was a member at the time of the hearing in this case. Knowing Campbell well because of their former association, Appleby was called as a witness by the respondent and sat with respondent's counsel at the hearing. We refer to this because the Board saw fit to comment upon it in its findings but, for what probative effect, it is not possible to perceive.

complaint, which issued ten months later (November 19, 1940), the complaint specified two other instances of alleged discriminatory discharge, viz., that of Knapp and of Oughten (Outten). The complaint, however, omitted any reference to the alleged discriminatory discharge of Faunce as contained in the charge. Such was the situation under the complaint, with respect to alleged discriminatory discharges, at the time the hearing was commenced before the Examiner on December 16, 1940.

After hearing, both the Examiner and the Board found that the respondent had not denied Knapp reinstatement "because of his union activities" and held that "the respondent's refusal to reinstate Knapp was not discriminatory." That left remaining only Outten's discharge so far as the original complaint was concerned.

As to Outten, the Examiner and the Board found that "the respondent in discharging Outten was motivated by the hostility he displayed toward the Association in throwing the Association membership card out of the window",—an incident that had occurred in Campbell's presence. There was no testimony that the respondent or its representatives knew anything about that incident when Outten was discharged except for Campbell's recitation of a conversation which he claims to have had with Adams, the assistant foreman, who discharged Outten. Campbell sought to imply by his testimony that Adams had discharged Outten because of the membership card episode. Adams testified that he had discharged Outten, who held a position as a first class welder, because he had done a careless and exceedingly faulty piece of welding on the hull of a ship. When asked whether he had discharged Outten, as Campbell had implied, because he had thrown an Association membership card out of the window, Adams answered "No, sir, and I don't know whether he belonged to the S. S. E. A. [Association] or CIO or A. F. of L. or anything else, as far as I was concerned." (R., p. 2571.) He further testified that Outten had never claimed that he was discharged or discriminated against because of the membership card incident. Outten himself (see Record pp. 2841–2849) admitted the inferiority of the particular piece of work, which he had done hurriedly in order to preempt the job for his own further attention when he returned to work on his next shift. He also admitted that

the inferior work was on an important part of the ship, down by the propeller shaft. About three months after his discharge Outten was rehired. This he accomplished by going to see Burke, the respondent's vice president, to whom he made an acknowledgment of his fault and of whom he requested re-employment. According to Outten, neither he nor Burke mentioned the Association. Burke expressed his pleasure that Outten "had told the truth about the whole thing" and then called Adams, the assistant foreman, and asked him about giving Outten another chance, which Adams did. At the time Burke and Adams thus acted to re-employ Outten, the latter was not a member of any labor organization. He did join the Association later because, as he frankly stated, it had interceded for him,—a not uncommon or unfair thing for an accredited bargaining agent to do nor for an employer to accede to. We think that the evidence was wholly insufficient to support an inference that the discharge of Outten was discriminatory or that it was intended to discourage membership in the Union and encourage membership in the Association. The case of Outten, a non-union employee, was the only instance which the Board accredits, of the two alleged discriminatory discharges cited for the whole of the year 1938. All told, in that year, out of the respondent's total of 4,234 employees, many of whom were members of the Union, 1,126 had been transferred and 30 more had been discharged in the ordinary course of the respondent's business.

After the hearing before the Examiner had been under way for almost five weeks and the need for a showing of discriminatory conduct was as urgent as it was apparent, Campbell scraped the bottom of the barrel and came up with the case of the alleged discriminatory discharge of Harris in 1937. Thereupon, on January 20, 1941, the complaint was amended to embrace, among other things, the case of Harris and to include four other alleged discriminatory discharges (Bailey, Voytovich, Hall and Polak), all of which were laid in 1940, subsequent to the filing of the charge although prior to the issuance of the original complaint. The amended complaint also revived the alleged discriminatory discharge of Faunce which the original complaint had ignored. After hearing, the Examiner found that the respondent had not discriminated in regard to the hire or tenure of Voytovich or Polak and recommended

that the complaint as to them be dismissed. The Union filed no exceptions to the Examiner's finding and recommendation in such regard and the Board thereafter found to like effect. That leaves then the cases of Harris, Faunce, Bailey and Hall.

Harris, a member of the Union, was a bolter and reamer in department 51. In June 1937 he applied for instruction in the welding school, to which he was admitted with the approval of his foreman, Neary. Although Campbell claims that he gave Harris "the works" while he was in the school, Harris, upon completing the course, took the test for welder and passed. Briggs, the foreman of the welding shop, told him that there were no tack welders' jobs open. Tack welding is the least skillful welding job and is the kind of work to which newly trained welders are ordinarily first assigned. Harris was put to work as a first class welder. Being unable to perform that task, he was discharged by Briggs on September 14, 1937. Accepting the fact that there were animosities among the employees in the welding shop because of differences in their respective labor affiliations, and assuming further that Briggs had put Harris at the more difficult work in order that he might fail, there was no evidence from which to infer that the respondent's management either approved or condoned such conduct. On the contrary, in this very instance, the Board finds that when Harris promptly complained of his discharge to Burke, the respondent's vice president, the latter immediately telephoned Vickers, the employment manager, and told him to disregard Harris' discharge slip because Briggs should not have sent him out as a first class welder. Thereupon Burke reinstated Harris in his former position in department 51, where he continued to work from September 15 to October 30, 1937. On the latter date Harris quit the employ of the respondent "allegedly because of the small amount of work he was receiving and his consequent inability to support his family on what he earned." As to the justification which Harris thus assigned for quitting his employment, the Board found against him as follows: "* * * Harris's testimony that he was not given a normal share of available work was denied by Neary, his foreman, and was contrary to the respondent's records which showed that Harris lost considerable time either of his own accord or because of inclement weather. We find, as did the Trial Examiner, that subsequent to September 15, 1937, Harris was not discriminated against with reference to the amount of work alloted to him." (Prior to September 15 he had been in the welding school and at welding.)

■ Notwithstanding that the Board found that Harris had quit his employment, and that the justification which he assigned for quitting was invalid, it, none the less, also found that Harris was discriminatorily discharged. This the Board did on the basis of the following speculative reasoning: "While Harris did not attribute his resignation on October 30 to the respondent's refusal to assign him a tack welding position upon completion of his course in the welding school, and while the respondent did not discriminate against him after he had been reinstated to Department 51, we nevertheless find that the respondent's prior discriminatory conduct was an important factor contributing to his leaving the respondent's employ. * * * The entire chain of events leading up to Harris's resignation must be considered as flowing from the respondent's prior discrimination, since had Harris been given a tack-welding position, there is every probability that he would still be in the respondent's employ." The inference was as unreasonable as it was unfounded. The duty to find the facts does not carry with it the prerogative of raising suspicion to the status of fact or of basing inferences upon mere speculation. Cf. National Labor Relations Board v. Columbian Enameling & Stamping Co., supra, 306 U.S. at page 300, 59 S.Ct. 501, 83 L.Ed. 660; also Appalachian Electric Power Co. v. National Labor Relations Board, loc. cit. supra.

Faunce was discharged by foreman Adams for absenting himself from his work under the following circumstances: Adams, seeing Faunce standing beside a fire, instructed him to return to work, which he did reluctantly and hostilely, according to Adams. Faunce then went to the lavatory, and when he returned he was handed a pink slip, which is a warning that the employee's work is unsatisfactory and that unless improvement is immediately shown, his employment will be terminated at the end of the week. That afternoon Adams returned and found Faunce absent. Adams waited a half hour before Faunce returned, which was within five minutes of quitting time. Adams thereupon discharged Faunce. The Board bases its finding of discriminatory discharge on Campbell's testimony that he had had Faunce's work changed at an earlier time in order to induce him to join

the Association, the fact that Burke made a memorandum for the record on Faunce's discharge, and the fact that neither Adams nor Gaskell (Faunce's "leader") had asked him when he returned to the job, where he had been, from which the Board inferred that he had been absent for a proper cause. We think the circumstances were insufficient to impute to the respondent a discriminatory discharge in the case of Faunce, and especially when it is considered that this is the only instance of an alleged discriminatory discharge for the year 1939, when the respondent had 5,877 employees, had transferred 611 of them and had discharged 68 in the ordinary course of the work, as to which no complaint is made. The only evidence to tie the company to participation in the discharge of Faunce is the fact that Burke made a memorandum of the occurrence. His reason for so doing was that from what he knew of the particular employee he deemed it prudent to record the matter for future reference. In this instance, as throughout this case, it is not to be overlooked that the record does not present the case of an employer hostile to organized labor or opposed to its employees' free choice of their own bargaining representative.

The cases of Bailey and Hall arose, as we have already pointed out, in the year 1940, after the filing of the charge whereon the complaint issued. Neither Bailey nor Hall was discharged. Each was transferred in his work and later each quit because of his dissatisfaction with the character of the work to which he was assigned. Aside from the incidental occurrences cited by the Board as tending to indicate that the transfers were intentionally discriminatory, the gravamen of the complaint in each of the two instances involves an argument as to whether either employee should have been transferred, rather than someone else, or no one. Suffice it to say that we think the evidence is insufficient to warrant an inference that either Bailey or Hall was transferred discriminatorily by the respondent, or that the circumstances of their transfers were such as to work discriminatory discharges out of their quitting their employment. Here, again, these two trans-

fers were the only instances of alleged discriminatory discharge for the year 1940 (which the Board accredited) when the respondent had 6,582 employees, of whom 303 were transferred and 65 were discharged during the year in the usual and ordinary operation of the respondent's business.

In conclusion, it is our opinion that there is no substantial evidence to support the Board's findings that the respondent interfered with, restrained and coerced its employees in the exercise of their right to self-organization, or that it dominated and interfered with the Sun Ship Employees Association, or that it discriminated in regard to the hire and tenure of its employees for the purpose of discouraging membership in the Union and of encouraging membership in the Association. Such being the case, it becomes unnecessary for us to pass upon the interesting contention which the Association, as an intervenor, advanced and ably argued both orally and by brief, viz., that even if the evidence were sufficient (which it is not) to support a finding that Campbell carried on his nefarious schemes in collusion with the respondent, still the Association has a right, under the undeniable circumstances, to have its entity and status protected and not destroyed. In support of this position the Association points out that its formation and organization was the spontaneous action of its constituent members, that it has served as their bargaining representative faithfully and well, and that, as the Board finds, Campbell never told the officers or members of the Association, except for Appleby (now no longer a member), of his improper activities. In fact, according to Campbell, he purposely withheld from the Association any knowledge of such conduct. It is the Association's further contention that the record discloses that Campbell aspires to a position of dominance in labor relations at the respondent's plant and that he is now working to that end through the complaining Union in the hope of extinguishing the Association although the latter is without proven fault.

The prayer for enforcement is denied; and a decree setting aside the Board's order will be entered.